Judy K. DISHMAN, Plaintiff,

v.

AMERICAN GENERAL ASSURANCE COMPANY, f/k/a U.S. Life Credit Life Insurance Company, Defendant.

No. C 01–3002–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Feb. 19, 2002.

Joel J. Yunek of Laird, Heiny, McManigal, Winga, Duffy & Sambaugh, P.L.C., Mason City, IA, for Plaintiff.

Michael W. Thrall of Nyemaster, Goode, Voights, West, Hansell & O'Brien, P.C., Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *FACTUAL BACKGROUND* ...............................................1078

II. *LEGAL ANALYSIS* ...................................................1082
 A. *Standards For Summary Judgment* ..................................1082
 1. *Requirements of Rule 56* ........................................1082
 2. *The parties' burdens* ..........................................1083
 B. *The Breach–of–Contract Claim* ...................................1083
 1. *Arguments of the parties* ......................................1083
 2. *Analysis* ......................................................1084
 a. *Governing law* ...............................................1084
 i. *Proving breach of contract* ...............................1084
 ii. *The misrepresentation defense* ...........................1085
 iii. *Issues presented* .......................................1085
 b. *Consideration of the record* .................................1087
 i. *"Falsity"*................................................1087
 ii. *"Knowledge of falsity" and "intent to deceive"* .............1089
 iii. *"Materiality," "reliance," and "would not have issued"*....1090
 iv. *Summary* ................................................1090
 c. *Waiver of the misrepresentation defense* .........................1091
 C. *The Reasonable Expectations Claim* ..............................1091
 1. *The claim as pleaded* ..........................................1091
 2. *The proffered amendment* ......................................1092
 a. *Untimeliness and prejudice* ..................................1092
 b. *Futility* ....................................................1093
 D. *The First–Party Bad Faith Claim* ................................1095
 1. *Arguments of the parties* ......................................1095
 2. *Analysis* ......................................................1095
 a. *Governing law* ...............................................1095
 b. *Consideration of the record* .................................1096
 E. *Jurisdiction* ...................................................1097

*III. CONCLUSION* ................................................... 1098

In this action, which was originally filed in the Iowa District Court for Cerro Gordo County on November 29, 2000, but removed to this federal court on January 4, 2001, plaintiff Judy K. Dishman asserts claims of breach of two credit life insurance contracts, breach of reasonable expectations concerning insurance coverage, and first-party bad faith denial of insurance claims. Mrs. Dishman alleges that these claims arise from the failure of defendant American General Assurance Company (AGAC) to pay claims on two of three credit life insurance polices following the death of her husband, Randall Dishman. In its answer, filed January 8, 2001, AGAC denied each of Mrs. Dishman's claims.

This matter comes before the court pursuant to Judy Dishman's July 2, 2001, motion for partial summary judgment on her claim of breach of contract and defendant AGAC's November 16, 2001, cross-motion for partial summary judgment. AGAC's motion seeks summary judgment on Mrs. Dishman's breach-of-contract claim, which AGAC argues also encompasses Mrs. Dishman's reasonable expectations claim. AGAC's motion also expressly seeks summary judgment on Mrs. Dishman's first-party bad faith claim and her prayer for punitive damages on the bad faith claim. The parties each resisted the other's motion for partial summary judgment after various extensions of time to do so.

The court heard oral arguments on the motions on February 14, 2002. Plaintiff Judy K. Dishman was represented at the oral arguments by Joel J. Yunek of Laird, Heiny, McManigal, Winga, Duffy & Sambaugh, P.L.C., in Mason City, Iowa. Defendant American General Assurance Company was represented by Michael W. Thrall of Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in Des Moines, Iowa.

After the oral arguments, on February 19, 2002, AGAC filed a Second Supplemental Appendix consisting of some additional records from the Franklin General Hospital. The cross-motions for summary judgment are now fully submitted. Trial in this matter is currently set to begin on April 15, 2002.

## I. FACTUAL BACKGROUND

Although the court will not attempt an exhaustive discussion of the undisputed and disputed facts presented by the record in this case, some discussion of the factual background is required to put in context Mrs. Dishman's claims and the parties' arguments for and against summary judgment. Those facts include a synopsis of the representations made by Randall Dishman at the time he applied for the credit life insurance policies at issue here, his health prior to and at that time, and what AGAC considered before denying Judy Dishman's claims under the policies.

Mr. Dishman applied for credit life insurance polices on three occasions at issue here, April 18, 1997, May 20, 1998, and September 30, 1998, as part of the purchase of motor vehicles. Each of the applications included the following "Debtor's Statement," which Randall Dishman signed:

> This is to certify that to the best of my knowledge I am now in good health and have not attained the age limit shown above. I have not been treated for, or been told I had, Cancer, Heart Disease or Acquired Immune Deficiency Syndrome (AIDS) within the past 3 years. If disability benefits are provided, I represent that I am free of any physical impairment and that I am gainfully employed at least 30 hours per week.

Plaintiff's Appendix at 1 (May 20, 1998, application), 3 (September 30, 1998, application),[1] & 39 (April 18, 1997, application).

It is undisputed that Mr. Dishman was gainfully employed at least 30 hours per week at the time he completed these applications. However, it is also undisputed that he had suffered from polio as a child and that, at the time he applied for each of the credit life insurance policies at issue here, he suffered from post-polio syndrome, including chronic obstructive pulmonary disease (COPD). Although the persons who prepared Mr. Dishman's credit life insurance applications at Hampton State Bank and Lafrenz Ford— persons Mrs. Dishman contends were consequently "agents" of AGAC whose knowledge is imputed to AGAC—knew that Mr. Dishman had had polio and were aware of visible effects of the disease, including limping and a twisted spine, there is no record evidence that they knew that Mr. Dishman suffered from COPD or other, not immediately obvious effects of post-polio syndrome.

It is also undisputed that Mr. Dishman had in fact been hospitalized in September 1996, November 1997, and February 1998, with the principal diagnosis on each occasion identified as "congestive heart failure," and additional diagnoses including COPD and post-polio syndrome. Dr. Hansen, Mr. Dishman's treating physician from 1980 until his death, repeatedly described Mr. Dishman in his records and deposition testimony as suffering from "congestive heart failure." However, Dr. Hansen now concurs with Dr. Levinson, a specialist who treated Mr. Dishman in 1994 and 1999, that Mr. Dishman did not

actually suffer from "congestive heart failure," but from a lung condition properly called "cor pulmonale." Prior to this concession, in his deposition testimony, Dr. Hansen testified that he had never actually told Mr. Dishman that he suffered from "heart disease" "in the sense of coronary artery disease or cardiomyopathy." Plaintiff's Appendix at 52, Deposition of Dr. Hansen (Depo. p. 42). However, he also testified that "heart disease" "can be ambiguous and interpreted a hundred ways," *see id.*, and that, while Mr. Dishman did not have coronary artery disease or cardiomyopathy, "he had stress on the [heart] muscle that can be considered disease because of the recurrent [heart] failure." *Id.* at 53 (Depo. at 47). When asked if he had ever treated Mr. Dishman for "heart disease," Dr. Hansen answered, "Only the failure," which he agreed was secondary to lung failure, which was secondary to scoliosis and polio. *Id.* (Depo. at 47–48).

Dr. Hansen and Dr. Levinson, Mr. Dishman's treating physicians, agree that Mr. Dishman was *not* in "good health" at any time, although his chronic, life-threatening conditions might be more or less well compensated by medical treatment at any particular time. Dr. Hansen opined that Mr. Dishman was *not* in "good health" in 1998 and had not been in "good health" since he had polio as a child; that use of the term "good health" in relation of Mr. Dishman was "a little strange," because of his chronic conditions; that Mr. Dishman had suffered gradual deterioration from 1980 until his death in 1999, in his post-polio myelitis, scoliosis, thoracic cage, and repeated insult to both his pulmonary and cardiac functions; and that Mr. Dishman

---

**1.** Although the only copy of this application in the record is an unsigned application showing an effective date of October 5, 1998, the parties agree that the Dishmans entered into this policy on September 30, 1998. *See* Plaintiff's Statement of Undisputed Facts, ¶ 3; Defen-

dant's Response to Plaintiff's Statement of Undisputed Facts, ¶ 3; *see also* Defendant's Statement of Undisputed Facts, ¶ 2; Plaintiff's Response to Defendant's Statement of Undisputed Facts and Statement of Disputed Facts, ¶ 2.

had been advised of his condition regularly since 1980. Dr. Levinson also testified that he believed that Mr. Dishman was not in "good health," because of the severe health problems and multiple hospitalizations resulting from post-polio syndrome. Mrs. Dishman acknowledged that Mr. Dishman was not in "good health" as far as a "normal person" was concerned, but that he was in "good health" for someone with post-polio syndrome. Defendant's Appendix at 24, Deposition of Judy Dishman (Depo. at 36). Specifically, she defined "good health" as "anybody that can do what they can do for the health that they're in." *Id.* at 24 (Depo. at 36).

Randall Dishman died on June 15, 1999. His death certificate states that the "manner of death" was "NATURAL," and that the "immediate cause of death" was "CEREBRAL ANOXIA," due to or as a consequence of "RESPIRATORY ARREST," due to or as a consequence of "COPD, MUSCULAR DYSTROPHY," due to or as a consequence of "SCOLIOSIS." The parties apparently agree that the reference to "muscular dystrophy" is an error. As Dr. Hansen explained, on June 11, 1999, Mr. Dishman had been admitted to the hospital in Mason City with an oxygen level and cardiopulmonary status so severe that he went into cardiopulmonary arrest, and, although he was resuscitated, he was later found to be brain-dead. The parties do not dispute that Mr. Dishman's death was the result of conditions that were ultimately caused by his polio.

The Dishmans' creditors made claims for death benefits on each of the credit life insurance policies identified above: Hampton State Bank made such a claim on July 19, 1999, on the policy that became effective on October 5, 1998; Don Lafrenz Ford made a claim on August 3, 1999, on the policy that became effective on May 20, 1998; and Ford Motor Credit made a claim on August 10, 1999, on the policy

that became effective on April 18, 1997. However, AGAC paid only the claim on the earliest of the policies, the April 18, 1997, one, and has since explained that it had to do so, because Mr. Dishman's death was outside of the period defined by the "incontestability" provision of that policy. However, none of the policies includes an express "incontestability" provision as to life insurance coverage.

AGAC denied the claims under the May 20, 1998, and October 5, 1998, policies by letters from Martin Daly, Claims Examiner, dated December 22, 1999, to Mrs. Dishman and Hampton State Bank. The letter to Mrs. Dishman stated the following:

> Careful consideration has been given to the claim filed for Randall M Dishman under certificate's [sic] 41207 and ND29989 issued 10/05/98 and 05/20/98. When the certificates were purchased, he signed it representing ***This is to certify that to the best of my knowledge I am now in good health and have not attained the age limit shown above. I have not been treated for, or been told I had, Cancer, Heart Disease or Acquired Immune Deficiency Syndrome (AIDS) within the past 3 years. If disability benefits are provided, I represent that I am free from any physical impairment and that I am gainfully employed at least 30 hours per week."***
>
> The information received from his physicians indicate [sic] the [sic] he had been treated for COPD beginning 01/24/96 and also on 07/15/96, 09/16/96, 11/24/97 and 02/10/98. Had we been advised of this, we would not have issued the insurance to him. Based on this the claims are not payable and we have rescinded the coverage back to the effective dates on the certificates.
>
> We have forwarded to our Accounting Department, a request for a refund of

the premiums paid for the coverage, which will follow under separate cover. If you have any questions regarding this claim, do not hesitate to contact our office.

Plaintiff's Appendix at 5. The letter from Mr. Daly to Hampton State Bank stated the following:

Based on the medical information received, Randall M Dishman misstated his health history when he applied for this insurance on 10/08/98, accordingly Mr Dishman was not eligible for the coverage. Had the company known of the misstatement, we would not have issued it to him. Therefore, we have made a request to our Accounting Department to refund the premiums paid for this insurance, which will follow under separate cover.

If you have any questions regarding this claim, do not hesitate to contact our office.

Plaintiff's Appendix at 6. The Executive Vice President of the Hampton State Bank also filed an affidavit averring that "on December 22, 1999, I received a call for U.S. Credit Life Insurance Company [AGAC's predecessor] indicating that they were denying coverage because Randall Dishman had been treated for chronic obstructive pulmonary disease and for congestive heart failure within a three-year period," and that he informed Mrs. Dishman of this call by letter dated December 22, 1999. See Plaintiff's Appendix at 20–21 (Affidavit of Mr. Raney) & 25 (Letter from Mr. Raney to Mrs. Dishman).

Mrs. Dishman contends that Mr. Daly had been directed by his supervisor to deny the claim based on misrepresentation before AGAC ever received Mr. Dishman's medical records. This argument is premised on an e-mail sent to Mr. Daly by his supervisor on October 8, 1999, which, as the court reads the poor quality photocopy in the record, states the following:

med. rec. show misrep by the ins. Contestable period is elig. Invest. med explained to the banker DM J. Hammen advised on conversation outlined below.

Plaintiff's Appendix at 41.

The record shows that AGAC made requests for Mr. Dishman's medical records at the Franklin General Hospital in Hampton, Iowa, on August 25, 1999, September 8, 1999, and September 22, 1999. The record also shows that Dr. Hansen responded to a request dated August 25, 1999, from Mr. Daly for certain information. In that response, Dr. Hansen stated that Mr. Dishman had been "diagnosed as having heart problems" in 1992, but Dr. Hansen was "not sure" if Mr. Dishman had been made aware of that diagnosis. Dr. Hansen's response was apparently received by AGAC on October 5, 1999, see Defendant's Appendix at 37, as apparently were Dr. Hansen's notes from the Franklin General Hospital, see id. at 8–16, as each bears a date stamp for that date, and Mr. Daly confirmed in his deposition that the date stamp indicates when AGAC received Dr. Hansen's response and the hospital records. See Plaintiff's Appendix at 89, Deposition of Mr. Daly (Depo. at 19–20). According to Mr. Daly's deposition testimony, his records indicate that he made requests for Dr. Hansen's office records on September 8, October 8, and October 20, 1999, and that he was told in response to the last request that the records had been sent some five days earlier. See id. at 89 (Depo. at 17–18). It is not clear when Mr. Daly received those records, although he agreed in his deposition that it was after October 8, 1999. Mr. Daly testified that he believed it would be wrong to deny a claim before he had received medical records. Id. at 91 (Depo. at 28).

As to the e-mail, Mr. Daly explained that he didn't know why the claims manag-

er, Carol Dimedico, who sent the e-mail, would have made the statement about misrepresentation, but that he did not take orders from her about disposition of claims; rather, she was his "supervisor" to the extent that he had to ask her if he wanted a day off. *Id.* at 92 (Depo. at 29–30). In any event, the claims on the credit life insurance policies were not denied until December 22, 1999, by which time, AGAC had obtained all of the medical records currently in the record and had obtained information from the persons responsible for taking Mr. Dishman's credit life insurance applications concerning the process followed in taking those applications.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo*, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.*, 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill*, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.*, 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part*, 202 F.3d 1035 (8th Cir.), *cert. denied*, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.*, 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd*, 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.*, 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.*, 963 F.Supp. 805 (N.D.Iowa 1997). Therefore, the court will survey only the essentials of these standards for present purposes.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim ... may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the out-

come of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484,

1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

### B. The Breach–of–Contract Claim

Both parties have moved for summary judgment in their favor on Mrs. Dishman's breach-of-contract claim. Indeed, both motions center on whether or not there are genuine issues of material fact as to whether Mr. Dishman misrepresented that he was in "good health" and/or that he had not been treated for, or been told that he had, "heart disease" within the three years preceding his various applications for credit life insurance.

### 1. Arguments of the parties

Mrs. Dishman contends that the insurance policies, including the language of the "Debtor's Statement," must be construed against AGAC, and that an undefined term, such as "good health," must be viewed by the court from the subjective viewpoint of the insured. Moreover, she argues that, under Iowa law, a "good health" representation cannot be taken as a "warranty." Nevertheless, she argues that "good health" isn't really the issue on the cross-motions for summary judgment; rather, the issue is Mr. Dishman's knowledge of his health, AGAC's agents' knowledge of his health, and hence, whether Mr. Dishman had any intent to deceive. Because Mr. Dishman had successfully dealt with his post-polio syndrome for thirty years, his wife contends that he could subjectively have believed himself to be in "good health," at least for a person with post-polio syndrome, and that he made no secret of his condition, so that he had no intent to deceive. She also contends that

AGAC waived its "misrepresentation" defense as to the two policies she alleges were breached, because AGAC paid on a third policy, the earliest one, and because its agents knew of Mr. Dishman's polio.

In its resistance to Mrs. Dishman's motion for partial summary judgment and in support of its own motion for summary judgment on this claim, AGAC contends that there is no genuine issue of material fact that Mr. Dishman was not in "good health." Even relying on the authorities cited by Mrs. Dishman, AGAC contends that Mr. Dishman was not in "good health," and could not have subjectively believed that he was, where he knew that he suffered from serious, chronic, and potentially life-threatening conditions that impacted his general health and continuance of health. AGAC points out that Mr. Dishman's treating physicians agree that he was not in "good health" and that he had been kept informed of his condition, and that Mrs. Dishman herself conceded that Mr. Dishman was not in "good health" as far as a "normal person" would be. AGAC contends, further, that it is not reasonable for anyone to harbor a subjective belief that "good health" means ability to "do what they can do for the health that they're in," because such a definition would exclude almost no one. Thus, AGAC contends that even a "subjective" view of "good health" cannot be unreasonable. This being so, AGAC contends that Mr. Dishman could not have had a reasonable belief that he was in "good health" according to the ordinary meaning of that term to a reasonable person, which in turn demonstrates that he knew his "good health" representations were false and that those representations were made with intent to deceive AGAC. Although AGAC contends that Mr. Dishman was not in

"good health" as a matter of law, which it contends is fully dispositive of Mrs. Dishman's breach-of-contract claim, AGAC also contends that, at a minimum, there are genuine issues of material fact as to whether or not Mr. Dishman was treated for "heart disease" between 1995 and 1998, which would defeat Mrs. Dishman's motion for partial summary judgment, in light of the repeated diagnoses of "congestive heart failure" during the three-year period preceding Mr. Dishman's applications for insurance. Finally, AGAC contends that there can be no waiver as to two of the policies on the basis that AGAC paid on a third policy, where the policy on which it paid had become "incontestable," but the other two policies had not.

### 2. Analysis

#### a. Governing law

■ **i. Proving breach of contract.** The "governing law" on Mrs. Dishman's breach-of-contract claims includes the elements of such a claim under Iowa law[2] and the standards for interpretation of terms, such as "good health," in an insurance contract. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Under Iowa law, "[i]n a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [the plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Molo Oil Co. v. River City Ford Truck Sales,*

---

**2.** The parties agree that, in light of the absence of any choice-of-law clause in the policies, this claim is governed by Iowa law.

*Inc.,* 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 825 (Iowa 1993)).

As the Iowa Supreme Court recently explained,

> Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court unless it depends on extrinsic evidence or a choice among more than one reasonable inference. *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 618 (Iowa 1991); *Farm Bureau Mut. Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 107–08 (Iowa 1981). In the construction of insurance policies, the cardinal principle is that the intention of the parties must prevail. If the language of the policy is unambiguous, as the parties concede it is in the present case, that intent is determined by what the policy itself says. *A.Y. McDonald,* 475 N.W.2d at 618. When words in a policy are left undefined, we give them the meaning that a reasonable person would understand them to mean. *Farm & City Ins. Co. v. Potter,* 330 N.W.2d 263, 265 (Iowa 1983).

*Monroe County v. International Ins. Co.,* 609 N.W.2d 522, 525 (Iowa 2000). In searching for the meaning of terms of a policy, even undefined or ambiguous terms, the rules of construction also require courts to avoid strained or unnatural interpretations. *See Coulter v. CIGNA Property & Cas. Companies,* 934 F.Supp. 1101, 1114 (N.D.Iowa 1996); *Continental Ins. Co. v. Bones,* 596 N.W.2d 552, 555–556 (Iowa 1999).

**ii. The misrepresentation defense.** "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Molo Oil Co.,* 578 N.W.2d at 224 (citing *Magnusson Agency v. Public Entity Nat'l Company–Midwest,*

560 N.W.2d 20, 27 (Iowa 1997)). An insurer has such a legal excuse from a claim of breach of an insurance contract, if it establishes, as an affirmative defense, that the applicant failed to answer questions on the application form fully and truthfully. *See, e.g., Higgins v. Blue Cross of Western Iowa and South Dakota,* 319 N.W.2d 232, 236–37 (Iowa 1982). Such a defense is established if the insurer proves the following by clear, convincing, and satisfactory evidence: (1) the applicant made a false representation or non-disclosure in connection with his application for insurance; (2) the representation or non-disclosure was material to the transaction, that is, the representation or non-disclosure materially affected the risk assumed by the insurer; (3) the applicant made the representation with actual knowledge of its falsity or reckless disregard of whether it was true or false or the applicant knowingly withheld material information; (4) the applicant intended to deceive the insurer; (5) the insurer relied on the applicant's representation or non-disclosure in issuing the insurance contract; and (6) the insurer would not have issued the insurance contract if it had known the true facts. *Id.* (finding that the trial court's instructions were in error, because they failed to include non-disclosure, and instead were stated only in terms of affirmative falsehood).

**iii. Issues presented.** The parties nowhere appear to dispute (1) that Mr. Dishman entered into the credit life insurance contracts with AGAC; (2) that the terms and conditions of the contracts required payment of a benefit in the event of Mr. Dishman's death; (3) that the Dishmans paid the required premiums; (4) that AGAC refused to pay the death benefit due under either of the latter two contracts upon Mr. Dishman's death; or (5) that the Dishmans suffered damages as a result of the breach of each of the contracts in dispute. *See Molo Oil Co.,* 578

N.W.2d at 224 (elements of a breach-of-contract claim). The lack of such a dispute would seem to establish Mrs. Dishman's breach-of-contract claim as a matter of law, leaving at issue only AGAC's affirmative defense of misrepresentation by Mr. Dishman in the applications for insurance.[3] *See Dezsi v. Mutual Ben. Health & Accident Ass'n,* 255 Iowa 1027, 125 N.W.2d 219, 222 (Iowa 1963) (holding that, where the plaintiff's decedent was insured under a policy issued by the defendant, the decedent was hospitalized and incurred expenses, but the defendant did not pay on the policy, "Plaintiff's case was established unless defendant was entitled to prevail under the affirmative defenses," including a defense that the plaintiff had misrepresented his health in the application for insurance).

The court and the parties agree that what is properly in dispute—when the controlling law is properly considered—is whether Mr. Dishman's answers to a possibly ambiguous question were *false,* whether he *knew his answers were false,* and whether he gave such answers with the *intent to deceive* AGAC about the condition of his health, *i.e.,* three of the elements of AGAC's affirmative defense.[4]

---

**3.** AGAC pleaded this affirmative defense in its Answer by alleging, "For further and complete defense to Plaintiff's allegations, Defendant states that Randall Dishman failed to disclose and misrepresented the state of his health in applying for the insurance policy and that Defendant rescinded the policy on the basis of these misrepresentations." Defendant's Answer, Count I, ¶ 7.

**4.** Mrs. Dishman's argument concerning the proper "construction" of the term "good health," which seems to focus on the second element of a breach-of-contract claim, relies primarily on a venerable decision by the Iowa Supreme Court, *Service Life Insurance Company of Omaha, Nebraska v. McCullough,* 234 Iowa 817, 13 N.W.2d 440 (Iowa 1944), as quoted in *Dezsi v. Mutual Ben. Health & Accident Ass'n,* 255 Iowa 1027, 125 N.W.2d 219, 223–24 (Iowa 1963). However, those arguments also plainly go to the elements of AGAC's affirmative defense.

Mrs. Dishman contended that, under *McCullough,* the term "good health" must be "viewed subjectively," that is, from the viewpoint of the insured. However, in *McCullough,* what might be read as authorizing a "subjective" "construction" was in the context of determining the *falsity* of the applicant's answer to an ambiguous question:

The insured was asked if he had had "any serious illness". These words are not specific or definite. They are all general and indeterminate. Different persons would differ as to what was a serious illness. Lord Bacon said: "All words, whether they be in deeds or statutes, or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and the person." Bacon's Law Max. Reg. 10, Cal.Lex.Jur. The insured was not asked whether he had diarrhea, occasionally, or frequently. But the insurer left to his judgment to say whether he had had an illness which he considered serious. Each knew that the subject of inquiry was his insurability. That being so the insured thought only of some illness which might have impaired his health and lessened his insurability. Certainly the question would not reasonably recall the diarrhea of August 1937, or such an indisposition at a later time. *"Where an insurance company or association seeks to avoid a policy or certificate of membership on the ground of falsity in the answer to a question which is by the terms of the contract made material, the court will construe the question and answer strictly as against the company, and liberally with reference to the insured. Stewart v. [Equitable Mut. Life] Association,* [110] Iowa [528, 529], 110 Iowa 528, 81 N.W. 782 [(1900)]. If any construction can *reasonably* be put on the *question and the answer* such as will avoid a forfeiture of the policy *on the ground of falsity of the answer,* that construction will be given, and the policy will be sustained." *Newton v. Southwestern Mut. Life Ass'n,* 116 Iowa 311, 317, 90 N.W. 73, 75 [(1902)]. "The idea is, that such a construction is to be put by the courts upon the language as an ordinary person of common understanding would put upon it when addressed to him for [an] answer." *Wilkinson v. Connecticut Mut.*

Again, AGAC must establish these elements according to the heightened standard of proof by clear, convincing, and satisfactory evidence to prevail on its defense and to defeat Mrs. Dishman's breach-of-contract claim. *Higgins*, 319 N.W.2d at 237.

### b. Consideration of the record

██ **i. "Falsity."** The court concludes that there are genuine issues of material fact as to whether or not Mr. Dishman falsely represented that he had

not been treated for, or told that he had, "heart disease" within the three years preceding his various applications for credit life insurance. It is undisputed that Mr. Dishman had frequently suffered from what had been diagnosed *at the time* as "congestive heart failure" during the three years before his credit life insurance applications were completed. However, Mrs. Dishman points to evidence that "congestive heart failure" does not fall within the ordinary meaning of "heart disease." For example, she points out that Mr. Dish-

---

*Life Ins. Co.*, 30 Iowa 119, 127, 6 Am. Rep.657 [(1870)]. "Because of the ambiguity, the information called for was uncertain, and *whether the answer was false* depends on the deceased's understanding of what was required. * * * *The material inquiry was whether the assured truthfully responded to the inquiry as he understood it.*" *Stewart v. Equitable Mut. Life Ass'n*, 110 Iowa 528, 531, 532, 81 N.W. 782, 783 [(1900)]. "The question is not, what did the company intend? but, rather, what had the policy holder a right to think was meant?" *Matthes v. Imperial Acc. Ass'n*, 110 Iowa 222, 228, 81 N.W. 484, 486 [(1900)]. See also *Washburn–Halligan Coffee Co. v. Merchant's, Brick Mut. Ins. Co.*, 110 Iowa 423, 432, 81 N.W. 707 [(1900)]; *Carter v. Humboldt Fire Ins. Co.*, 17 Iowa 456, 461 [(1864)].
*McCullough*, 13 N.W.2d at 444 (emphasis added). Even this "liberal construction" of *the question and answer* with reference to the insured, which Mrs. Dishman takes to be a "subjective" viewpoint, however, has "objective" limitations: Only if a "construction can *reasonably* be put on the question and the answer such as will avoid a forfeiture of the policy on the ground of falsity of the answer," will that construction be given. *Id.* As to construction of *terms* of the insurance contract, moreover, the court in *McCullough* stated a classic definition of an "objective," or "reasonable person," standard: " 'Contracts of insurance should not be construed through the magnifying eye of a technical lawyer, but rather from the standpoint of what *an ordinary man* would believe the contract to mean.' " *McCullough*, 13 N.W.2d at 444 (quoting *Murphy v. New York Life Ins. Co.*,

219 Iowa 609, 258 N.W. 749, 751 (1935)) (emphasis added). ·
 Reading *McCullough* in light of the Iowa Supreme Court's subsequent decision in *Higgins*, this court concludes that what is meant in *McCullough* by "construction of the question and answer" to determine whether the policy should be avoided on the ground of falsity in the answer to a question, *see id.* at 444, is more clearly delineated in *Higgins* as "falsity" of the applicant's response to the insurer's inquiry *and* "knowledge of falsity." *Compare McCullough*, 13 N.W.2d at 444 (stating the "material inquiry" to be "whether the assured truthfully responded to the inquiry *as he understood it* ") (emphasis added), *with Higgins*, 319 N.W.2d at 236–37 (the insurer must prove that the representation was not only "false" but that the applicant actually knew that it was false or recklessly disregarded its truth or falsity). While "falsity" is itself an "objective" element, "knowledge of falsity" has both a "subjective" formulation in *Higgins*, as "actual knowledge of falsity," and an "objective" formulation, as "reckless disregard of whether such representation was true or false." *Id.* at 237 (quoting the trial court's jury instructions, which were correct as to misrepresentation, but erroneous to the extent that they excluded a finding that the defense had been proved on the basis of a non-disclosure, defined as "knowingly with h[o]ld[ing] material information"). Moreover, in *McCullough*, the Iowa Supreme Court then considered whether there was any evidence that the answer of the insured was made with the fraudulent intent to deceive the insurer. *See McCullough*, 13 N.W.2d at 446; *and compare Higgins*, 319 N.W.2d at 237 (the next element is proof that the representations were made with intent to deceive).

man's EKG was "normal" in 1994, and that, after the fact, Mr. Dishman's treating physician stated in deposition that he did not believe that Mr. Dishman ever suffered from "heart disease," when that term is narrowly defined as "coronary artery disease or cardiomyopathy." A post-hoc, expert opinion on the technical meaning of "heart disease" would not necessarily support Mrs. Dishman's argument, where "heart disease" was not defined in the contracts, so that the question is whether "congestive heart failure" was "heart disease" "from the standpoint of what *an ordinary man* would believe the contract to mean.'" *McCullough*, 13 N.W.2d at 444 (quoting *Murphy v. New York Life Ins. Co.*, 219 Iowa 609, 258 N.W. 749, 751 (Iowa 1935)) (emphasis added); *see also Monroe County*, 609 N.W.2d at 525 (undefined terms in an insurance policy "must be give[n] ... the meaning that a reasonable person would understand them to mean"). However, Mr. Dishman's treating physician also recognized that "heart disease" "can be ambiguous and interpreted a hundred ways," although he also testified that Mr. Dishman certainly "had stress on the [heart] muscle that can be considered disease because of the recurrent [heart] failure." In light of the record evidence, an "ordinary person's" reading of the term "heart disease" could exclude the conditions from which Mr. Dishman suffered, which had an *effect* on his heart, but were not necessarily *diseases of the heart*, so that Mr. Dishman's answer that he had not been treated for or told that he had "heart disease" was not necessarily false as a matter of law.

▆▆▆▆ On the other hand, the court concludes that Mr. Dishman's statement that he was in "good health" at the time of the applications was false as a matter of law. Again, where this key term was not defined in the applications or policies, it "must be give[n] ... the meaning that a reasonable person would understand [it] to

mean," *Monroe County*, 609 N.W.2d at 525(citing *Farm & City Ins. Co.*, 330 N.W.2d at 265), and not some strained or unnatural interpretation. *See Coulter*, 934 F.Supp. at 1114; *Bones*, 596 N.W.2d at 555–556. While *McCullough* establishes that a representation of "good health" is not a "warranty," and does not require that the applicant be "absolutely free from all bodily infirmities, or tendencies to disease," *see McCullough*, 13 N.W.2d at 444–45, or free from any and all "temporary ailments," *see id.* at 447, it does define "good health," in accordance with the meaning a reasonable person would give the term, as being free from " 'a vice in the constitution or [ailment] so serious as to have some bearing on the general health and continuance of health; that is, such as according to common understanding, would be called a disease.'" *Id.* at 447 (quoting *Seiverts v. National Ben. Ass'n*, 95 Iowa 710, 716, 64 N.W. 671 (1895), and citing other decisions in accord). According to any "common understanding," a person suffering from post-polio syndrome of such severity that consequences of that syndrome include several hospitalizations for COPD and heart failure in the last several years, coupled with warnings from his doctor of the chronic and deteriorating nature of his ailments, is *not* in good health. To adopt any definition of "good health" that would encompass such an individual would be to give the term a very "strained or unnatural interpretation." *See Coulter*, 934 F.Supp. at 1114; *Bones*, 596 N.W.2d at 555–556. Similarly "strained and unnatural," and plainly contrary to the understanding of an ordinary person, is Mrs. Dishman's definition of "good health" to mean a person's ability to "do what they can do for the health that they're in." Therefore, a person in Mr. Dishman's condition at the time he made the applications was, as a matter of law, suffering from what must be called a "dis-

ease" and that disease was quite plainly "'a vice in the constitution or [ailment] so serious as to have some bearing on the general health and continuance of health,'" *see McCullough*, 13 N.W.2d at 447, such that any representation that he was in "good health" was objectively false. This conclusion defeats Mrs. Dishman's motion for summary judgment on her breach-of-contract claim, because AGAC can—and has—established as a matter of law the "falsity" element of its affirmative defense, which Mrs. Dishman directly challenged in her motion for summary judgment on this claim.

▮▮▮▮▮ *ii. "Knowledge of falsity" and "intent to deceive."* What this conclusion on the element of "falsity" as to the "good health" representations does *not* do is establish that AGAC is entitled to summary judgment on Mrs. Dishman's breach-of-contract claim, because it does not establish as a matter of law the remaining elements of AGAC's affirmative defense, which include "knowledge of falsity" and "intent to deceive." *See Higgins*, 319 N.W.2d at 236–37. As the court indicated above, in footnote 4, it is with regard to these elements, and particularly with regard to "knowledge of falsity" that the rules of construction stated in *McCullough* for the *question and answer*, which examine the insured's subjective viewpoint, are most applicable. *See McCullough*, 13 N.W.2d at 444 ("'Where an insurance company or association seeks to avoid a policy or certificate of membership on the ground of falsity in the answer to a question which is by the terms of the contract made material, the court will construe the question and answer strictly as against the company, and liberally with reference to the insured. *Stewart* v. [*Equitable Mut. Life*] *Association*, [110] Iowa [528, 529], 81 N.W. 782 [(1900)]. If any construction can *reasonably* be put on the *question and the answer* such as will avoid a forfeiture of the policy *on the ground of falsity of the*

*answer*, that construction will be given, and the policy will be sustained.' *Newton v. Southwestern Mut. Life Ass'n*, 116 Iowa 311, 317, 90 N.W. 73, 75 [(1902)].") (emphasis added). Even so, if the court were the trier of fact, it would find that the objective falsity of Mr. Dishman's representations that he was in "good health" provide such strong inferences of "knowledge of falsity"—at least in the sense of "reckless disregard for the truth"—and "intent to deceive" that these elements of AGAC's defense are also established. However, the court is not entitled to weigh the evidence in this way on a motion for summary judgment; rather, the court can only determine whether there are genuine issues for trial. *Quick*, 90 F.3d at 1376–77.

Although perhaps tenuously and just barely, Mrs. Dishman has designated "specific facts showing that there is a genuine issue for trial," FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, on the elements of "knowledge of falsity" and "intent to deceive" with regard to the "good health" representations, through her *written* submissions, which were not directly aimed at doing so, and her oral presentation. Those facts are essentially what she has marshaled in an attempt to show that Mr. Dishman could "subjectively," or even "reasonably," have believed that he was in "good health," because he had controlled his post-polio syndrome and resulting chronic conditions for many years and was able to maintain full-time employment. Moreover, in light of evidence that Mr. Dishman made no effort to hide the fact that he had had polio and continued to suffer some consequences from the disease, the fact that "intent" is the quintessential jury question, and in light of the heightened burden of proof—by clear, convincing, and satisfactory evidence—that is applicable to an insurer's misrepresentation defense, the court declines to grant partial summary judgment in AGAC's fa-

vor on its affirmative defense, even though the falsity of the "good health" representation is established as a matter of law.

*iii. "Materiality," "reliance," and "would not have issued."* Prior to the oral arguments, no party asserted that the representations about "good health" or "heart disease" were not material, had not been relied upon in issuing the insurance, or that AGAC would not have issued the insurance if Mr. Dishman had responded differently to the statement in the application. *See Higgins,* 319 N.W.2d at 236–37. At the oral arguments, the court raised *sua sponte* the question of whether or not AGAC would be required to prove materiality, the insurer's reliance on the representations, and that the insurer would not have issued the insurance contract if it had known the true facts—rather than, for example, "rating up" the premium, which might entitle AGAC only to the difference in premiums rather than rescission of the insurance policies—*even if* the court concluded, as a matter of law, that the "good health" representation was false, that Mr. Dishman knew it was false, and that he intended to deceive AGAC, such that AGAC still would not be entitled to summary judgment on its affirmative defense. *See Higgins,* 319 N.W.2d at 236–37. In response, AGAC argued that there are no genuine issues of material fact as to the "materiality," "reliance," and "would not have issued" elements on the basis of the present record.

The applications and nature of the contracts themselves established the materiality of the representations. *See McCullough,* 13 N.W.2d at 444 (noting that an inquiry may be made material by the terms of the contract). Also, the court agrees that, at this point, the record raises little doubt as to the "reliance" and "would not have issued" elements. Mrs. Dishman has not generated any evidence *so far* to challenge the claims examiner's state-

ments, in his denial letters, that AGAC would not have issued the insurance policies, had Mr. Dishman not misrepresented his health history, so that AGAC would have known the true facts. Finally, AGAC pointed to deposition testimony of the claims examiner, which appears to be unchallenged, that premiums were not changed on the basis of the applicant's response to the "Debtor's Statement," but that the credit life insurance policies simply would not have been issued if the applicant declined to make the required representations. *See* Plaintiff's Appendix at 86 (Deposition of Mr. Daly at p. 7).

However, Mr. Daly's deposition testimony on the matter is somewhat equivocal, because he acknowledges that he was "not in that end of the business," *i.e.,* the determination of premiums and decisions to issue policies. *Id.* Also, the court *sua sponte* raised issues concerning the "materiality," "reliance," and "would not have issued" elements of AGAC's affirmative defense. Consequently, Mrs. Dishman may not have had a full and fair opportunity to marshal evidence regarding these elements. Therefore, the court will consider these elements still at issue at trial.

*iv. Summary.* The court concludes that AGAC, rather than Mrs. Dishman, is entitled to partial summary judgment on her claim of breach-of-contract, but only to the extent that the court concludes, as a matter of law, that AGAC has established one element of its affirmative defense of misrepresentation, the "falsity" of Mr. Dishman's representation that he was in "good health." Because a false representation about "good health" has been established as a matter of law, AGAC need only establish the remaining elements of its defense as to that representation, and need not establish any elements of its defense as to the "heart disease" representation, to defeat Mrs. Dishman's breach-of-contract

claim. On the other hand, nothing in this ruling necessarily precludes AGAC from attempting to establish its affirmative defense on the alternative basis that Mr. Dishman misrepresented his health as to whether he had been treated for, or told that he had, "heart disease."

### c. *Waiver of the misrepresentation defense*

 Mrs. Dishman asserts one further ground for summary judgment in her favor on her breach-of-contract claims, which is that, even if Mr. Dishman somehow misrepresented his health history, AGAC has waived a misrepresentation defense, because AGAC's agents were aware of Mr. Dishman's polio, and because it paid on one of the three insurance contracts. Although Mrs. Dishman has presented affidavits from the persons who solicited each of the insurance applications to the effect that they were aware that Mr. Dishman had suffered from polio and were aware of the visible effects of the disease, including limping and a twisted spine, there is no record evidence that they knew that Mr. Dishman suffered from COPD or other, not immediately obvious effects of post-polio syndrome or the frequency of his hospitalizations. Thus, as to this ground for "waiver," Mrs. Dishman has failed to "identif[y] those portions of the record which show lack of a genuine issue" that AGAC's agents were fully aware of Mr. Dishman's health at the time of his applications. *Hartnagel,* 953 F.2d at 395.

 As to waiver by payment, even assuming that AGAC could waive its defenses as to two later, and entirely independent, contracts by paying on one policy, AGAC has not, as a matter of law, done so in this case. Although AGAC has failed to identify any express "incontestability" provision as to life insurance in any of the credit life insurance policies at issue here, such a provision is nevertheless estab-

lished for each of the policies as a matter of law. IOWA CODE § 508.28 provides, "The policy shall be incontestable after it shall have been in force during the lifetime of the insured for two years from its date, except for nonpayment of premiums." Thus, the earliest policy, which was entered into in April of 1997, was "incontestable" at the time of Mr. Dishman's death in June of 1999, but the later two policies were not. AGAC waived nothing as to two "contestable" policies by paying on a third policy that had become "incontestable." Hence, Mrs. Dishman is not entitled to summary judgment on her breach-of-contract claim on the ground that AGAC has waived its misrepresentation defense.

### C. *The Reasonable Expectations Claim*

### 1. *The claim as pleaded*

Mrs. Dishman's second claim is that AGAC breached her reasonable expectations of insurance coverage, because AGAC's attempted construction of the insurance contracts "is bizarre and oppressive, eviscerates a term to which all parties have explicitly agreed or eliminate[s] the domina[nt] purpose of the policy." *See* Complaint, Count II, ¶¶ 6–7. Although the court finds no reference to Mrs. Dishman's claim of breach of reasonable expectations in the parties' cross-motions for partial summary judgment, counsel for AGAC represented at the oral arguments on the parties' cross-motions for partial summary judgment that it had intended its motion to include all of Mrs. Dishman's claims, because AGAC's counsel could perceive no distinction between Mrs. Dishman's claim of breach of contract and her claim of breach of reasonable expectations. In response, Mrs. Dishman's counsel contended that the "breach-of-contract" and "reasonable expectation" claims are not mutually exclusive or duplicative. Counsel contended in support of the latter claim that, if

Mrs. Dishman had been asked why the Dishmans bought the credit life policies, they would have said it was "because of [Mr. Dishman's] polio," which counsel again contended was a condition known to AGAC's agents at the time the polices were written. The implication of Mrs. Dishman's argument appears to be that her reasonable expectations of coverage to pay off the loans if her husband died from polio-related causes should not be defeated by contentions that he misrepresented his health in the insurance applications, where both parties were aware of his polio, and both knew the reasons that the Dishmans were seeking such coverage.

At the oral arguments, the parties agreed that summary judgment on the reasonable expectations claim was appropriate if the court granted summary judgment in favor of AGAC on its affirmative defense of misrepresentation, because no expectation of coverage could be reasonable where the insured misrepresented his health on the insurance application. However, that situation does not now obtain, because the court has denied both parties' motions for partial summary judgment on the basis of the misrepresentation defense. Thus, the court must consider whether the reasonable expectations claim is viable.

■ At the oral arguments, the court opined that the "reasonable expectations" claim appears strange on its face, because it alleges that Mrs. Dishman "had reasonable expectations that the contracts [at issue] would provide coverage in the event of Randall Dishman's death by accidental causes," see Complaint, Count II, ¶ 6, but, as discussed above, it is undisputed that Mr. Dishman died of natural causes—respiratory failure ultimately caused by post-polio syndrome—not any "accidental causes." Mrs. Dishman conceded that "accidental causes" are not at issue and that the reference to "accidental causes" in this count of her Complaint was an inadvertent typographical error. The court concludes that the reasonable expectations claim, as presently pleaded, fails to state a claim upon which relief can be granted, because Mr. Dishman's death was not, and was not alleged to be, "by accidental causes." The court also finds that Mrs. Dishman has so conceded by acknowledging that "accidental causes" are not at issue and by seeking leave to amend the claim.

### 2. The proffered amendment

■ Rather than asserting the viability of the reasonable expectations claim as pleaded, Mrs. Dishman's counsel made an oral motion to amend Count II of her Complaint by striking "by accidental causes." AGAC argued that any amendment at this point was far too late in the game, and in any event, did not establish a distinction between the breach-of-contract claim and the reasonable expectations claim that would allow the latter to survive if the former didn't.

### a. Untimeliness and prejudice

The court concludes that it is, indeed, too late to permit Mrs. Dishman to amend her reasonable expectations claim by striking the reference to "by accidental causes," under either Rule 16(b) or Rule 15(a). The deadlines for amendments, discovery, and dispositive motions under the Rule 16 scheduling order entered in this case are now past; Mrs. Dishman has not shown "good cause" for the untimely amendment; and AGAC would be prejudiced by reopening discovery or the deadline for dispositive motions on the amended reasonable expectations claim, with resulting delay to the trial, which is now less than two months away. See In re Milk Products Antitrust Litig., 195 F.3d 430, 437 (8th Cir.1999) ("When the district court has filed a Rule 16 pretrial scheduling order, it may properly require that good cause be shown for leave to file an amended pleading that is substantially out of time under

that order," because " '[i]f we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure,' " quoting *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (11th Cir.1998), and holding that, even under a Rule 15(a) standard, a motion to amend may be denied as untimely where it would require reopening discovery and further delay, because that is precisely the sort of prejudice that justifies denial of a motion to amend under Rule 15(a)), *cert. denied sub nom. Rainy Lake One Stop, Inc. v. Marigold Foods, Inc.*, 529 U.S. 1038, 120 S.Ct. 1534, 146 L.Ed.2d 348 (2000). Thus, the oral motion to amend the reasonable expectations count will be denied pursuant to Rule 16(b) on the basis of its untimeliness and the absence of "good cause" to alter the deadlines, and pursuant to both Rule 16(b) and Rule 15(a) on the basis that leave to amend would prejudice AGAC by delaying these proceedings.

#### b. *Futility*

In addition, or in the alternative, the court will not allow amendment of the reasonable expectations claim pursuant to Rule 15(a), because the proposed amendment is futile. *See, e.g., Wiles v. Capitol Indemnity Corp.*, 280 F.3d 868, 871 (8th Cir.2002) ("Leave to amend [pursuant to Rule 15(a)] should be denied if the proposed amended pleading would be futile); *Grandson v. University of Minn.*, 272 F.3d 568, 575 (8th Cir.2001) (same). This is so, because the reasonable expectations claim, even if amended as Mrs. Dishman

proposes, would fail to state a claim upon which relief can be granted.

As the Iowa Supreme Court recently explained,

Under the reasonable expectations doctrine

the objectively reasonable expectations of applicants and intended beneficiaries regarding insurance policies will be honored even though painstaking study of the policy provisions would have negated those expectations. The doctrine is carefully circumscribed and does not contemplate the expansion of coverage on a general equitable basis. It can only be invoked when an exclusion is bizarre or oppressive, eviscerates terms explicitly agreed to, or eliminates the dominant purpose of the transaction. *A preliminary criterion must be satisfied before we apply the doctrine. The policy must either be such that an ordinary layperson would misunderstand its coverage, or there must be circumstances attributable to the insurer which would foster coverage expectations.*

*Krause [v. Krause]*, 589 N.W.2d [721,] 727 (Iowa 1999) (emphasis added) (citations omitted).... The question [is whether] an ordinary layman would misunderstand the coverage provided by the policy or that the uncontroverted pleadings established "circumstances attributable to [the insurer] which would foster coverage expectations." *See id.* *Westfield Ins. Cos. v. Economy Fire & Cas. Co.*, 623 N.W.2d 871, 881–82 (Iowa 2001) (*en banc*).[5] Although "the issue of

---

**5.** Similarly, in a still more recent decision not yet released for publication, the Iowa Supreme Court explained the "reasonable expectations" doctrine as follows:

The doctrine is a narrow one, employed by courts only "when the insurance coverage provided eviscerates terms explicitly agreed

to or is manifestly inconsistent with the purpose of the transaction for which the insurance was purchased." *Monroe County v. Int'l Ins. Co.*, 609 N.W.2d 522, 526 (Iowa 2000). Applicability of the doctrine turns on proof that an ordinary layperson would misunderstand the policy's coverage, or cir-

reasonable expectations is a factual matter, not a legal matter," *see id.* at 881, Mrs. Dishman has not pleaded or proposed to plead either of the preliminary criteria for her reasonable expectations claim.

Count II of Mrs. Dishman's Complaint, as currently pleaded, does not identify anything about the policies at issue here that would cause an ordinary layperson to misunderstand their coverage, and she does not propose to add any such allegations. To the extent that she contends that the term "good health" is not one an ordinary layperson would understand, the court disagrees. As explained above, in reference to Mrs. Dishman's breach-of-contract claim and AGAC's misrepresentation defense, in *McCullough,* the Iowa Supreme Court provided a definition of "good health" in accordance with what an "ordinary layperson would understand," concluding that it meant being free from " 'a vice in the constitution or [ailment] so serious as to have some bearing on the general health and continuance of health; that is, such as according to common understanding, would be called a disease.' " *McCullough,* 13 N.W.2d at 447. Thus, Mrs. Dishman has not pleaded, or proposed to plead, the first of the alternative allegations necessary to invoke the reasonable expectations doctrine. *Westfield Ins. Cos.,* 623 N.W.2d at 881–82.

Furthermore, there are absolutely no allegations in, incorporated into, or proposed for Mrs. Dishman's reasonable expectations claim of circumstances attributable to AGAC that would foster coverage expectations. *See id.* at 882 (second alternative preliminary criterion). The only facts in the present record on which Mrs. Dishman could possibly base such a contention are that AGAC's agents knew about Mr. Dishman's polio. However, those allegations, even if they were offered as allegations in an amendment of the reasonable expectations claim, would not, as a matter of law, suffice as pleading of "circumstances attributable to the insurer which would foster coverage expectations." *Id.* Although Mrs. Dishman has presented affidavits from the persons who solicited each of the insurance applications to the effect that they were aware that Mr. Dishman had suffered from polio and were aware of the visible effects of the disease, including limping and a twisted spine, there is no allegation, either made or offered, in the complaint and no record evidence that those agents of AGAC knew that Mr. Dishman suffered from COPD or other, not immediately obvious effects of post-polio syndrome, or the frequency of his hospitalizations, from which a viable reasonable expectations claim or a jury question might be generated on whether the agents' solicitation of the insurance policies fostered coverage expectations for someone who was not in "good health" as a matter of law.

Moreover, implicit in the court's conclusion that Mr. Dishman's "good health" representation was false as a matter of law, in reference to AGAC's misrepresentation defense to Mrs. Dishman's breach-of-contract claim, are the conclusions that, as a matter of law, AGAC's interpretation of "good health" is not bizarre or oppressive, does not eviscerate any terms explicitly agreed to, or eliminate any dominant purpose of the transaction. *See id.* at 881 (elements of "reasonable expectations"). The court explained above that the outcome of the misrepresentation defense

cumstances attributable to the insurer fostered coverage expectations. *Krause v. Krause,* 589 N.W.2d 721, 728 (Iowa 1999); *Benavides v. J.C. Penney Life Ins. Co.,* 539 N.W.2d 352, 357 (Iowa 1995).

*Grinnell Select Ins. Co. v. Continental Western Ins. Co.,* 639 N.W.2d 31, 37 (Iowa 2002).

turns on Mr. Dishman's "knowledge of falsity," according to either the subjective standard of "actual knowledge," or the objective standard of "reckless disregard of truth or falsity," and subjective "intent to deceive." However, genuine issues of material fact about Mr. Dishman's subjective beliefs and intent would not generate genuine issues of material fact on a reasonable expectations claim, which is premised entirely on an *objective* standard: The reasonable expectations doctrine honors only "the objectively reasonable expectations of applicants and intended beneficiaries regarding insurance policies." *See id.* Mrs. Dishman has not pleaded, or offered to plead, any circumstances suggesting that Mr. Dishman's expectations of coverage despite his poor health were objectively reasonable, nor has she, or could she, point to any circumstances in the record generating a genuine issue of material fact as to whether Mr. Dishman's expectations of coverage were objectively reasonable.

Thus, Mrs. Dishman's oral motion to amend her reasonable expectations claim will be denied and that claim, as pleaded, will be dismissed for failure to state a claim on its face.

### D. The First–Party Bad Faith Claim

Mrs. Dishman's third claim in this lawsuit is that AGAC acted in bad faith in denying her claims against the credit life insurance policies, because AGAC knew or had reason to know that there was no reasonable basis for denying her claims against the policies. Only AGAC has moved for partial summary judgment on this claim, with a separate argument that, even if the claim can go forward, AGAC is entitled to summary judgment on Mrs. Dishman's prayer for punitive damages on it.

#### 1. Arguments of the parties

AGAC contends that, far from acting in "bad faith," it had a reasonable basis for denying Mrs. Dishman's claims, because those claims were "fairly debatable." AGAC details the medical records it considered before denying Mrs. Dishman's claims, and argues that, based on the number of hospitalizations and treatments by Dr. Hansen, it is reasonable to conclude, or at least fairly debatable, that Mr. Dishman was not in "good health," and that, based on the repeated diagnoses of "congestive heart failure," it was reasonable for AGAC to believe that Mr. Dishman had been treated for "heart disease" within three years of applying for the insurance policies. AGAC also contends that its investigation extended to consideration of statements from the persons responsible for taking the insurance applications, and that the information obtained indicates that Mr. Dishman misrepresented his health history and treatment on the applications and to the agents.

Mrs. Dishman, however, argues that there is objective evidence that AGAC's investigation was merely a pretext for a predetermined denial of her claim. This evidence, she argues, is the e-mail from the claims manager to the claims examiner which she contends directs the examiner to take the position that the medical records showed misrepresentation before those medical records were ever received. She argues, further, that AGAC failed to verify Dr. Levinson's information that Mr. Dishman had never suffered from congestive heart failure or any other heart problem before denying her claims.

#### 2. Analysis

##### a. Governing law

The "governing law" for Mrs. Dishman's first-party bad faith claim, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, was recently explained by the Iowa Supreme Court as follows:

To establish a first-party bad-faith claim, " 'a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim.' " *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (quoting *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 690, 271 N.W.2d 368, 376 (1978)). A reasonable basis exists for denying insurance benefits if the claim is "fairly debatable" as to either matters of fact or law. *Id.*

*Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001). As to what is "fairly debatable," in another decision, the Iowa Supreme Court explained,

> An insurance company has the right to challenge claims that are "fairly debatable" without being subject to a bad faith tort claim. [*Sampson v. American Standard Ins. Co.*, 582 N.W.2d 146, 150 (Iowa 1998) ]. Thus, when an objectively reasonable basis for denying a claim exists, the insurer cannot be held liable for bad faith as a matter of law. *Id.* The debate may involve a dispute concerning an issue of fact or law. *Id.* The reasonable basis for denying the claim, however, must exist at the time the claim is denied. *Id.*

*Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 346 (Iowa 1999). In evaluating whether a reasonable basis for the denial existed, it is appropriate to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review. *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988). However, " '[i]n a first-party bad faith claim, "an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." ' " *Seastrom*, 601 N.W.2d at 347 (quoting *Sampson*, 582 N.W.2d at 152, in turn quot-

ing *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254–55 (Iowa 1991)). "In fact, where an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim." *Id.*

### b. *Consideration of the record*

■ The court concludes that AGAC has met its "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue" on the first-party bad faith claim, *see Hartnagel*, 953 F.2d at 395, but that Mrs. Dishman has not designated "specific facts showing that there is a genuine issue for trial" on this claim, *see* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548, even viewing all the facts in the light most favorable to Mrs. Dishman and giving her the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377 (same). Rather, as a matter of law, AGAC had a reasonable basis for denying Mrs. Dishman's claims, because those claims were "fairly debatable" as to matters of fact. *Gibson*, 621 N.W.2d at 396; *Seastrom*, 601 N.W.2d at 346.

Specifically, at the time AGAC denied Mrs. Dishman's claim, December 22, 1999, *see Seastrom*, 601 N.W.2d at 346 (the reasonable basis for denying the claim must exist at the time the claim is denied), AGAC had previously received (on October 5, 1999) Dr. Hansen's response to its inquiries, indicating that Mr. Dishman had been "diagnosed as having heart problems" in 1992, although Dr. Hansen was "not sure" if Mr. Dishman had been made aware of that diagnosis; Dr. Hansen's notes from the Franklin General Hospital, showing several hospitalizations for "congestive heart failure," COPD, and other post-polio syndrome conditions; all of the other med-

ical records concerning treatment currently in the record; and information from the persons responsible for taking Mr. Dishman's credit life insurance applications concerning the process followed in taking the applications. In light of these records, the question of whether Mr. Dishman had misrepresented that he was in "good health" and had not been treated for, or told that he had, "heart disease" was "fairly debatable." *Gibson,* 621 N.W.2d at 396; *Seastrom,* 601 N.W.2d at 346.

Although it is appropriate in deciding whether a claim is "fairly debatable" to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review, *see Dolan,* 431 N.W.2d at 794, Mrs. Dishman has failed to generate a genuine issue of material fact that the investigation here was flawed or pretextual on the basis of the October 8, 1999, e-mail from the claims manager to the claims examiner. First, there is no reasonable inference that the claims manager's statement that the medical records showed misrepresentation was made before any medical records were received, when the record shows, and Mr. Daly confirmed, that AGAC had received Dr. Hansen's records from Franklin General Hospital on October 5, 1999. Moreover, " ' "an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim," ' " *Seastrom,* 601 N.W.2d at 347 (quoting *Sampson,* 582 N.W.2d at 152, in turn quoting *Reuter,* 469 N.W.2d at 254–55), which is the situation that obtained here, even if the investigation was somehow "imperfect," because there was no objectively reasonable basis for denying the claims as shown by the records available to AGAC on December 22, 1999, when the claim was actually denied.

Nor do Dr. Levinson's assurances to AGAC on January 10, 2000, that Mr. Dishman had never had "heart disease" generate the necessary genuine issue of material fact, because by that time, AGAC had not only denied the claim, but had an objectively reasonable basis for doing so. *See id.* ("[W]here an insurer has an objectively reasonable basis to deny coverage, it has no duty to investigate further before denying the claim."). Moreover, the fact that Dr. Levinson, well after the fact, opined that Mr. Dishman had never had "heart disease" does not change the fact that, during his hospitalizations, Mr. Dishman had repeatedly been diagnosed with, and told that he had, congestive heart failure, such that his failure to disclose that condition prior to Dr. Levinson's revision of the record and his failure to disclose what was plainly not "good health," whether or not he actually had "heart disease," provided a "fairly debatable" basis for denying claims against his credit life insurance policies.

Thus, AGAC is entitled to summary judgment on Mrs. Dishman's first-party bad faith claim. Because the claim itself fails as a matter of law, the court need not consider separately whether or not AGAC is entitled to summary judgment on Mrs. Dishman's prayer for punitive damages on that claim.

### E. Jurisdiction

■ At the oral arguments, Mrs. Dishman raised an issue of some concern: Could the court continue to exercise jurisdiction over this removed diversity action, if AGAC was entitled to summary judgment on Mrs. Dishman's prayer for punitive damages, where only the prayer for punitive damages put sufficient amount in controversy to sustain diversity jurisdiction and make the action removable? In the absence of any possibility of an award of punitive damages, the amount in contro-

versy on Mrs. Dishman's surviving claim is only the benefit due under the credit life insurance policies, approximately $38,000, not the $75,000 currently required for diversity jurisdiction. *See* 28 U.S.C. § 1332(a). However, the Supreme Court answered the question raised here some time ago in *St. Paul Mercury Indemnity Company v. Red Cab Company*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). In *St. Paul Mercury*, the defendant removed the diversity action to federal court, and the district court entered a judgment for the plaintiff in an amount below the amount in controversy required to establish subject matter jurisdiction. The plaintiff subsequently lowered the damages sought to an amount below the required amount in controversy. *Id.* at 285, 58 S.Ct. 586. The Court of Appeals reversed, finding that the district court should have remanded the case to the state court. *Id.* However, the Supreme Court reversed the appellate court's decision, and reinstated the district court's decision, holding that "events occurring subsequent to removal which reduce the amount recoverable, whether beyond the plaintiff's control or the result of his volition, do not oust the district court's jurisdiction once it has attached." *Id.* at 293, 58 S.Ct. 586; *accord Kansas Pub. Employees Retirement Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067–68 (8th Cir.) ("The existence of this [removal] jurisdiction is determined at the time of removal, even though subsequent events may remove from the case the facts on which jurisdiction was predicated."), *cert. denied*, 519 U.S. 948, 117 S.Ct. 359, 136 L.Ed.2d 250 (1996). Thus, notwithstanding that this court has entered summary judgment in favor of AGAC on Mrs. Dishman's bad faith claim and the claim for punitive damages thereon, this court retains jurisdiction over this removed action, even though the amount in controversy now, as a matter of law, does not exceed the jurisdictional amount in controversy for a diversity action.

### III. CONCLUSION

Notwithstanding that Mrs. Dishman's breach-of-contract claim was subject to cross-motions for partial summary judgment, the court concludes that neither party is entitled to summary judgment on that claim in its entirety. The court finds that Mr. Dishman's representations regarding his "good health" were false as a matter of law, but the court also finds that there are genuine issues of material fact under the law governing AGAC's affirmative defense of misrepresentation as to the "knowledge of falsity" and "intent to deceive" elements. On the other hand, AGAC is entitled to summary judgment on Mrs. Dishman's reasonable expectations claim. The claim as pleaded fails to state a claim upon which relief can be granted, and Mrs. Dishman's proffered oral amendment is untimely, made without a showing of "good cause," would prejudice AGAC, and is ultimately futile. Neither the claim as pleaded or as proffered in an oral amendment states a claim upon which relief can be granted, nor are there facts in the record which, if alleged, would suffice to state such a claim. AGAC is also entitled to partial summary judgment on Mrs. Dishman's first-party bad faith claim and the prayer for punitive damages thereon, because the claims against the credit life insurance policies were "fairly debatable" as to matters of fact, with regard to Mr. Dishman's representations concerning both "good health" and "heart disease." Notwithstanding that there is no longer an amount in controversy in excess of $75,000 in this removed diversity action, the court retains jurisdiction, because events subsequent to removal do not divest the court of removal jurisdiction.

THEREFORE,

1. Mrs. Dishman's motion for partial summary judgment is **denied** in its entirety.

2. Mrs. Dishman's oral motion to amend her reasonable expectations claim is **denied**, and **that claim, as pleaded or proffered, is dismissed** for failure to state a claim upon which relief can be granted.

3. AGAC's motion for partial summary judgment is

a. **denied** as to Mrs. Dishman's breach-of-contract claim, with the exception that AGAC has established the falsity of Mr. Dishman's representation of "good health" as a matter of law;

b. **granted** as to Mrs. Dishman's claim of reasonable expectations, either as pleaded or as proffered by oral amendment, and that claim is dismissed; and

c. **granted** as to Mrs. Dishman's claim of first-party bad faith and the prayer for punitive damages thereon, and that claim and prayer for punitive damages thereon are dismissed.

3. This court retains jurisdiction over the remaining claim, Mrs. Dishman's breach-of-contract claim, and this matter will proceed to trial on that claim on April 15, 2002.

**IT IS SO ORDERED.**