Veronica **SAMPSON,** Appellant,

v.

**AMERICAN STANDARD INSURANCE COMPANY,** Appellee.

No. 97–1098.

Supreme Court of Iowa.

July 29, 1998.

Peter M. Soble, Rock Island, Illinois, for appellant.

Patrick L. Woodward and Patricia Rhodes Cepican of McDonald, Stonebraker & Cepican, P.C., Davenport, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, NEUMAN and TERNUS, JJ.

McGIVERIN, Chief Justice.

Plaintiff Veronica Sampson appeals the district court's ruling entering partial summary judgment in favor of defendant American Standard Insurance Company (American Standard) and dismissing her first-party bad faith claim for failure to pay benefits under the uninsured motorist and medical expenses coverage provisions of an automobile insurance policy issued to her by American Standard. We affirm.

## I. Background facts and proceedings.

On November 30, 1995, plaintiff Veronica Sampson was involved in an automobile collision with a vehicle driven by Katherine Williams. Neither driver appeared to be seriously injured in the collision and no ambulance was called to the scene. Sampson and Williams were both able to drive their vehicles after the accident. Sampson did not immediately seek medical attention for any injuries received from the accident, but did see Dr. Robert Illingworth at the Palmer College of Chiropractic (Palmer Clinic) for neck and headache pain later that day.

Following the accident, Sampson contacted defendant American Standard, her automobile insurance carrier. Sampson's automobile policy with American Standard provided $2000 in coverage for medical expenses and $25,000 in uninsured motorist (UM) coverage. American Standard appraised the damage to Sampson's vehicle and issued a check under Sampson's collision coverage to cover the costs of repairing the vehicle.

On December 18, Sampson spoke with American Standard claims adjuster, Rich Heller. Heller indicated that American Standard had concluded that Williams was 100 percent at-fault for the accident, but that Williams was not insured at the time of the accident. Heller then explained to Sampson the uninsured motorist benefits included in her policy. During this conversation, Sampson informed Heller that she had missed time from work, apparently from injuries she sustained from the accident. American Standard later issued checks to Sampson under the UM coverage to reimburse her for lost time from work and also made payments to Palmer Clinic under the medical coverage for treatment provided to Sampson between November 30 and December 13.

Heller and Sampson spoke again on January 29, 1996, and Heller's notes from this conversation report that Sampson advised Heller that she would receive treatment at Palmer Clinic for an additional three to four months. Heller's notes also indicate that American Standard agreed to wait until Sampson finished treatment to conclude her claim for benefits. On February 16, American Standard paid a supplemental repair bill

for Sampson's vehicle and issued another payment to Palmer Clinic on March 21 under the medical expenses coverage for treatment provided to Sampson.

Heller and Sampson next spoke on April 1, at which time Sampson advised Heller that she was still having neck pain and that she was still being treated at Palmer Clinic. After their conversation, Heller wrote to Palmer Clinic requesting copies of Sampson's medical records, including preaccident records. Palmer Clinic responded to Heller's request on April 4. The records American Standard received from Palmer Clinic concerning Sampson began at page forty-nine with the first entry being for Sampson's visit the day of the accident. In a note to the file, Heller stated that Sampson's postaccident records "are replete with intervening accidents." This comment was apparently based in part on the fact that Sampson had received treatment at Palmer Clinic prior to the November 30 accident.

From his review of Sampson's case so far, Heller believed that Sampson had sustained a soft tissue injury. Based on his experience in adjusting soft tissue injuries, on May 1, 1996, Heller offered Sampson $1000, in addition to amounts previously paid, to settle the claim.[1] Sampson rejected this offer and in response, demanded that American Standard pay her $25,000, the full limits of her UM coverage. Heller refused her demand. Sampson then made a comment about hiring an attorney. In response to this comment, Heller suspended his file to a later date to see if Sampson retained an attorney.

Sampson hired attorney Peter Soble shortly thereafter. At Soble's recommendation, Sampson was examined on May 13 by Dr. Robert Milas, a neurosurgeon. According to Dr. Milas, Sampson made no comments about ongoing medical problems, a history of neck pain, or problems with radicular pain prior to November 30, 1995, the day of the accident. Dr. Milas's diagnosis at the end of the examination was that of cervical radiculopathy.

On May 23, 1996, Dr. Illingworth from Palmer Clinic wrote to Heller stating that Sampson's medical expense coverage under the American Standard policy should cover the injuries she received from the November 30, 1995, accident. The letter also explained that Sampson had been treated at the clinic since March 23, 1992, for low back pain and that the November 30 accident aggravated her complaints of low back pain.

Dr. Milas next examined Sampson on May 28, 1996, after she had undergone an MRI scan. Dr. Milas's diagnosis after this examination was that Sampson had a syrinx or cavity in her spinal cord at the C6–C7 level. Attorney Soble wrote to Heller on June 7, enclosing a letter from Dr. Milas explaining his diagnosis and impliedly reasserting a demand to settle Sampson's claim for the full limits of UM coverage under the policy.

American Standard took no action concerning Soble's demand for the full limits of UM coverage under the policy. However, Heller wrote to Soble on July 18, stating that American Standard was continuing its investigation concerning Sampson's injuries. Heller explained that he had consulted with American Standard's medical services department concerning Sampson's injuries and that the department recommended that additional records be obtained. Heller thus requested additional records from Soble to "determine the value of Ms. Sampson's uninsured motorist claim" and stated he would contact Soble once American Standard had a chance to review the records.

Heller again wrote to Soble on July 25, noting that he had received Sampson's MRI films and that the films had been sent to the medical services department. On July 26, 1996, before American Standard could have the records reviewed by a specialist, attorney Soble demanded that the films be returned, based on his belief that American Standard had been given adequate time to review the records. Defendant complied with Soble's demand and returned the records.

Four days later, attorney Soble filed a petition on Sampson's behalf against American Standard in district court, asserting claims for breach of contract and bad faith

---

1. At the time of its $1000 offer to Sampson, American Standard had paid medical expenses of $577.00, property damage of $2095.10, and lost wages of $120.00.

for failure to pay benefits under the uninsured motorist coverage provision of the policy.

American Standard filed a motion for partial summary judgment concerning Sampson's bad faith claim. The district court concluded that the extent and compensable amount of the injuries Sampson sustained from the November 30, 1995, accident was fairly debatable. The district court thus concluded that American Standard had a reasonable basis for refusing to pay Sampson the full limits of UM coverage under the policy and granted American Standard's partial summary judgment motion.

The matter proceeded to trial concerning the value of Sampson's uninsured motorist breach of contract claim. The jury awarded Sampson $3574.32 for past medical expenses, $3000 for future medical expenses, $513 for past loss of wages, $2000 for past pain and suffering, and $3000 for future pain and suffering, totaling $12,087.32. The district court, however, later granted American Standard's motion for a directed verdict concerning Sampson's claim for damages for future pain and suffering and reduced the jury's verdict by the $3,000 awarded by the jury for that item of damages. The court entered judgment in Sampson's favor in the amount of $9,087.32, together with interest and costs.

On appeal, Sampson asserts that the district court erred in granting partial summary judgment concerning her bad faith claim against American Standard, but raises no issue as to the jury's verdict and the judgment concerning her uninsured motorist contract claim.

## II. Standard of review.

Our review of a grant or denial of summary judgment is at law. Iowa R.App. P. 4; *Gabrilson v. Flynn*, 554 N.W.2d 267, 270 (Iowa 1996). Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party is entitled to

judgment as a matter of law. Iowa R. Civ. P. 237(c); *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 201 (Iowa 1997). To determine whether there is a genuine issue of material fact, the court must examine the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Iowa R. Civ. P. 237(c). The record here consists of the pleadings, affidavits and exhibits. We review the record in the light most favorable to the party opposing summary judgment; in this sense, we consider a motion for summary judgment as we would a motion for directed verdict. *Smith v. CRST Int'l, Inc.*, 553 N.W.2d 890, 893 (Iowa 1996). Under this standard, summary judgment is inappropriate if reasonable minds would differ on how the issue should be resolved. *Dickerson v. Mertz*, 547 N.W.2d 208, 212 (Iowa 1996).

## III. Sampson's bad faith claim.

### A. Background law.

Sampson's bad faith claim stems from American Standard's refusal to settle the claim for the full limits of UM ($25,000) coverage under the policy. Specifically, Sampson contends the district court erred in sustaining defendant American Standard's motion for partial summary judgment concerning her claim for bad faith. Although the record is unclear as to whether Sampson's bad faith claim was also based on failure to pay benefits under the medical coverage provision of the policy ($2000), she does raise this issue on appeal.

To be successful in a first-party bad-faith claim, a plaintiff must prove by substantial evidence (1) the absence of a reasonable basis for denying the claim, and (2) that the defendant knew or had reason to know that its denial was without reasonable basis.[2] *Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988) (recognizing a tort cause of ac-

---

**2.** In *Thompson v. United States Fidelity & Guar. Co.*, 559 N.W.2d 288, 291 (Iowa 1997), a workers compensation carrier appealed a district court ruling denying its motion for a directed verdict concerning a claim for bad faith in terminating a worker's benefits. *Id.* at 290. We noted in *Thompson* that the standard of review concern-

ing a motion for directed verdict is whether substantial evidence existed to support each element of the plaintiff-insured's case. *Id.* at 290–91. Although the present case involves an appeal of a grant of partial summary judgment, the substantial evidence standard is likewise applicable. *See Smith*, 553 N.W.2d at 893.

tion against insurer for bad-faith conduct concerning insured's claim); *see also Thompson v. United States Fidelity & Guar. Co.,* 559 N.W.2d 288, 291 (Iowa 1997). Evidence is substantial if a reasonable mind would accept it as adequate to reach a conclusion. *Stover v. Lakeland Square Owners Ass'n,* 434 N.W.2d 866, 873 (Iowa 1989) (citations omitted).

An insurance company has the right to debate claims that are "fairly debatable" without being subject to a bad faith tort claim. *Morgan v. American Family Mut. Ins. Co.,* 534 N.W.2d 92, 96 (Iowa 1995). Thus, when an objectively reasonable basis for denying the claim exists, the insurer as a matter of law cannot be held liable for bad faith. *Id.* The debate may involve a dispute concerning an issue of fact or of law. *Id.* The reasonable basis for denying the claim, however, must exist at the time the claim is denied. *See Morgan,* 534 N.W.2d at 96; *Central Life Ins. Co. v. Aetna Cas. & Sur. Co.,* 466 N.W.2d 257, 263 (Iowa 1991). "The absence of a reasonable basis for denying the claim is an objective element." *Morgan,* 534 N.W.2d at 96.

In *Thompson* we discussed whether the "fairly debatable" issue in a bad-faith case is a question of law for the court or a question for the jury. 559 N.W.2d at 290. We stated that the answer to this question depends on the facts of the individual case. *Id.* Based on the facts as presented in *Thompson,* we concluded that the fairly debatable issue was a question appropriately decided by the court. As explained below, we conclude that under the facts of the present case, the fairly debatable issue was also a question of law for the district court.

**B. Application of the law to present case.**

We first point out that the situation here is not one where the insurer has flatly denied the insured's claim for benefits. *Cf. Morgan,* 534 N.W.2d at 95 (insured filed claim for uninsured motorist benefits, which insurer denied after its claims committee reviewed insured's medical records). In fact, American Standard made payments to Sampson under the policy provisions; it reimbursed Sampson for lost wages under UM coverage and also paid Palmer Clinic under the medical coverage provisions for Sampson's treatment immediately after the accident, in March 1996, and again in September 1996, after Sampson filed her petition. Nothing in the record shows that American Standard refused to pay any bills submitted by Sampson. Rather, American Standard refused Sampson's demand to settle the claim for the full limits of UM coverage under the policy.[3]

The question we must consider is whether American Standard had a reasonable basis for refusing to honor Sampson's settlement demand for the full limits of UM and medical coverage under the policy. Upon our review of the record, we conclude that it did.

1. The record presents several facts showing that Sampson's claim was fairly debatable, thus giving American Standard a reasonable basis for refusing to honor Sampson's demand for the full limits of UM and medical coverage. First, the parties seem to agree that the records American Standard had in its possession at the time attorney Soble made his settlement demand included: (1) copies of Sampson's postaccident records from Palmer Clinic; (2) copies of Dr. Milas's letters addressed to attorney Soble concerning Sampson's diagnosis;[4] and (3) the MRI film.

The fact that the Palmer Clinic records, that American Standard initially received, started on page forty-nine suggested that Sampson had received chiropractic treatment at Palmer Clinic prior to the November 30

---

3. It appears that American Standard did not affirmatively deny Sampson's demand for the full limits of UM coverage under the policy until after it received Sampson's pre-accident records from Palmer Clinic.

4. Heller received copies of letters written by Dr. Milas to attorney Soble concerning Sampson's

condition, but never received copies of the actual medical records prior to the filing of the petition. It appears that American Standard eventually obtained Sampson's pre-accident records from Palmer Clinic by subpoena after Sampson filed her petition.

accident, a fact later confirmed by Dr. Illingworth's May 23, 1996, letter.[5] This fact raised a question in American Standard's view as to causation concerning Sampson's medical complaints, as conveyed to Dr. Milas, and whether those complaints could be attributed to the November 30 accident. In other words, whether the November 30 accident caused Sampson's present medical complaints was "fairly debatable." We thus conclude that American Standard therefore had a reasonable basis for refusing to settle Sampson's claim for the full policy limits of UM coverage. Cf. Dolan, 431 N.W.2d at 794 (no bad faith where insured's previous back injury raised a fairly debatable issue concerning whether insured had any residual disability when the accident for which insured sought benefits occurred).

The fact that Dr. Illingworth and Dr. Milas opined that Sampson's diagnosis of a syrinx or cavity in her spinal cord and associated physical complaints were caused by the accident did not make American Standard automatically obligated to pay Sampson the full limits of coverage available under the policy. This is because "[a]n insurance company is not obligated to disregard the opinion of its own expert in favor of the insured's expert's opinion." Morgan, 534 N.W.2d at 97.

2. We believe that American Standard reasonably declined to honor Sampson's settlement demand for the full limits of UM and medical coverage until it had a chance to fully investigate the claim. Cf. Dolan, 431 N.W.2d at 794 (insured had right to depose plaintiff-insured and his physician before offering settlement amount). This fact is important because an insurer has a right to conduct an investigation concerning claims made by its insured. See Hoekstra v. Farm Bureau Mut. Ins. Co., 382 N.W.2d 100, 111 (Iowa 1986) (insurer had right to investigate cause and origin concerning fire in insured's home); Pirkl v. Northwestern Mut. Ins. Ass'n, 348 N.W.2d 633, 635 (Iowa 1984) (in the course of investigating a claim, insurer may require the insured to present adequate proof of loss before paying the claim); Amsden v. Grinnell Mut. Reinsurance Co., 203 N.W.2d 252, 255 (Iowa 1972) (noting that insurer could not be expected to pay a loss during investigation of fire at insured's business).

We also point out that Sampson's policy expressly states that an insured must provide the insurer "with medical, employment and other records and documents we request, as often as we reasonably ask, and permit us to make copies." The policy also states that American Standard has the right to investigate claims for benefits under the UM and medical coverage provisions of the policy.[6] Sampson thus was put on notice concerning her duty to provide records to American Standard. Sampson likewise was put on notice that American Standard would exercise its right to investigate any claims for benefits under the policy, including the right to determine whether medical bills presented by her were reasonable in amount, appropriate and necessary, and incurred because of the November 30 accident. Cf. AMCO Mut. Ins. Co. v. Lamphere, 541 N.W.2d 910, 914 (Iowa App.1995) (insured's lack of cooperation in

5. Palmer Clinic records show that on March 23, 1992, Sampson complained of constant neck pain and stiffness, frequent back pain and pain between the shoulders, and occasional upper extremity pain/numbness. At the time Sampson sought treatment at Palmer Clinic on the day of the accident, she complained of lower back pain.

6. Sampson's policy with respect to medical coverage provides as follows:
    We will pay **reasonable medical expenses** for **appropriate and necessary** medical ... services performed within one year of the accident because of an accident related **bodily injury** to an **insured person**.... We reserve the right to determine, or to have someone on **our** behalf determine, whether any treatment is medically **appropriate and necessary**, and

whether any charge incurred is **fair, usual and customary.**
(Emphasis in original.) Sampson's policy also states that the insured has a duty to "[a]ssist **us** in any claims or suits," to submit to a physical exam at insurer's expense, and provide medical records and documents requested by the insurer.
· With respect to uninsured motorist coverage, Sampson's policy states the following:
    We will pay compensatory damages for **bodily injury** which an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle.** The **bodily injury** must be sustained by an **insured person** and must be caused by accident and arise out of the **use** of the **uninsured motor vehicle.**
(Emphasis in original.)

providing documents requested by insurer established an objectively reasonable basis for denial of coverage and plaintiff-insured thus failed to present sufficient evidence to support bad faith claim).

 We also reject Sampson's contention that American Standard's investigation was inadequate. In a first-party bad faith claim, "an imperfect investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 254–55 (Iowa 1991); *see also Hollingsworth v. Schminkey*, 553 N.W.2d 591, 596 (Iowa 1996); *but cf. Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 35 (Iowa 1982) (failure to investigate, standing alone, may establish bad faith in *third-party* bad faith claim).

3. In summary, we conclude that reasonable minds would not differ in finding that Sampson's claim for benefits under the policy was fairly debatable, based on Sampson's medical records, or lack thereof, that American Standard had in its possession at the time of the settlement demand. Sampson thus failed to produce substantial evidence that American Standard lacked a reasonable basis for denying her policy limits claim. *See Thompson*, 559 N.W.2d at 292. Accordingly, the initial question of whether Sampson's claim for the full policy limits of UM and medical coverage was fairly debatable was appropriate for the district court to decide as a matter of law.

We have considered other arguments raised by plaintiff and find them unnecessary to address or without merit.

## IV. Disposition.

We conclude that reasonable minds would not differ in finding that Sampson's claims, that defendant pay to her its full limits for uninsured motorist and medical coverage, under the policy issued by defendant were fairly debatable. American Standard thus had an objectively reasonable basis for denying Sampson's demand as a matter of law. The district court therefore properly granted de-

fendant American Standard's motion for partial summary judgment, and we affirm.

**AFFIRMED.**