# IN THE COURT OF APPEALS OF IOWA

No. 20-0020
Filed May 12, 2021

**AUTO-OWNERS INSURANCE COMPANY,**
    Plaintiff-Appellant/Cross-Appellee,

**vs.**

**RAUL RUIZ ROSAS d/b/a BLUE FLAME FLOORING,**
    Defendant-Appellee/Cross-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Sarah Crane and Joseph Seidlin (trial), Judges.

A workers' compensation insurance carrier appeals the dismissal of its breach of contract claim seeking more premium payments. A claimant cross-appeals the dismissal of his bad-faith claim. **AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

CeCelia C. Ibson of Ibson Law Firm, Des Moines, for appellant.

Patrick B. White of White Law Office, P.C., Des Moines, for appellee.

Considered by Doyle, P.J., and Mullins and Greer, JJ.

**DOYLE, Presiding Judge.**

A workers' compensation insurance carrier, Auto-Owners Insurance Co. (AOIC), filed a breach-of-contract suit against Raul Ruiz Rosas d/b/a Blue Flame Flooring[1] seeking over $50,000 in more premium payments allegedly due under two workers' compensation insurance policies issued to Rosas. Rosas counter-claimed stating that AOIC's pursuit of additional premiums was in bad faith.

The bone of contention is whether the roofers that worked on jobs with Rosas were employees of Rosas or independent contractors. If the workers were employees, additional premium payment obligation was triggered under the policies, potentially putting Rosas on the hook for over $50,000. If the workers were not employees, Rosas needed not pay premiums on top of those already paid. Following a bench trial, the district court found, "All of the reliable evidence showed that not only was Rosas not an employer, but he was one of a group of independent contractors working for themselves." The court held that "AOIC did not show that Rosas paid remuneration to persons engaged in work that could make AOIC liable to pay workers compensation. It therefore failed to meet its burden to prove the premium owed to it by Rosas." The court dismissed AOIC's breach-of-contract action. And finding no basis for a bad-faith claim, the court dismissed Rosas's counterclaim.

---

[1] Rosas, a sole proprietor, does business as "Blue Flame Roofing." Rosas's application for workers' compensation insurance, insurance policy documents, premium notices, audit reports, notice of cancellation, and correspondence from insurance carriers to Rosas, all reflect the name of Rosas's business to be "Blue Flame Roofing." The "Blue Flame Flooring" appellation first shows up as Rosas's dba in AOIC's petition at law and has been perpetuated throughout the litigation since. Not wanting to foul up the system, we left the flawed caption as it came to us.

On appeal, AOIC makes many arguments that the district court erred in denying its motion for summary judgment and in dismissing its petition. On cross-appeal, Rosas argues the district court erred in dismissing his bad-faith claim. After reviewing the record, we agree with the district court's decisions.

## I. Facts and Proceedings.

Raul Rosas immigrated to the United States in 1986 and does not speak, read, or write English. Spanish is his native tongue. Rosas is a self-employed roofer and runs his residential roofing business "Blue Flame Roofing" as a sole proprietorship. Rosas and other self-employed roofers worked on jobs together, splitting the pay. No one roofer had to obtain the work. Payee for the work was always Rosas and Blue Flame. Asked why, Rosas responded that it was because he had "papers" and the other roofers working with him did not. He would receive the payment for the job and then split it with his fellow roofers. At the end of the year Rosas issued Form 1099's to his fellow roofers. He did not withhold any funds for his fellow roofers' taxes or benefits.

Someone told Rosas to purchase workers' compensation insurance for his business.[2] He applied for and obtained the insurance through the "assigned risk" market. Under Iowa Code section 515A.15, employers who are unable to obtain workers' compensation insurance through the traditional market may find insurance through an "assigned risk" market. *See Travelers Indem. Co. v. Commissioner of Ins.*, 767 N.W.2d 646, 647 (Iowa 2009). The "assigned risk"

---

[2] With some exceptions, Iowa employers are required to obtain insurance covering their liability for workers' compensation benefits. *See* Iowa Code § 87.1, .14A (2014).

market is a means for insurers to allocate the underwriting risk for a proportionate share of applicants who are unable to find coverage options in the voluntary market. *Id.* Management of "assigned risk" policies is overseen by a rating organization, in this case, the National Council on Compensation Insurance (NCCI). *Id.* When an employer applies for coverage in this market, the NCCI assigns the employer to a participating insurance carrier. Once assigned, the insurer cannot refuse to provide coverage. "The annual premium charged by an assigned carrier for the risk is determined by an algorithm which takes into account the increased risk of a particular employer based on the employer's claim history." *Id.*

On a form application for workers' compensation insurance, Rosas stated he was a sole proprietor doing business as Blue Flame Roofing and that he wished to be excluded from coverage. The form shows the nature of the business to be: "RESIDENTIAL ROOFING, NO EMPLOYEES, NO HELPERS." The application asks "Are sub-contractors used?" and Rosas answered no. Rosas paid the estimated annual premium of $700. NCCI issued a binder effective July 18, 2014, and assigned AOIC as Rosas's workers' compensation insurance carrier. AOIC then issued a worker's compensation insurance policy to Rosas showing a policy period from July 8, 2014 to July 8, 2015 (first policy).

The insurance contract provided the final premium "will be determined after this policy ends by using the actual, not estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy." Similarly, the contract contained an audit provision, which permitted AOIC to "conduct audits during regular business hours during the policy period and

within three years after the policy ends . . . [and] information developed by audit will be used to determine final premium."

About two months after the policy issued, AOIC sent a "Supplementary Underwriting Information Request" to Rosas asking him to provide information detailing Blue Flame's "helpers, day labor, contract labor, subcontractors and employees." The letter also asks, "Are any subcontractors used? If so, how many?" Rosas did not respond. Nearly four weeks later, AOIC sent a second request. Rosas's insurance agent responded to the request, stating, "He has no subcontractors and no helpers and no employees." An attached list of workers form shows "None."

The policy renewed effective July 14, 2015 (second policy). Rosas paid $800 as an initial annual premium for this second policy.

In August 2015, AOIC sent a "Policyholder Audit Report" to Rosas to audit the first policy. Rosas did not recall seeing this document or responding to it. In any event, a response was sent to AOIC. The response to "Tell us about your business" was: "I'm subcontractor for roofing companies and I sub-contract this jobs to different people." Company structure was described as: "Individual." Rosas's 2014 Federal Form 1040 Schedule C was included with the response. It shows, among other things, $145,997 in gross receipts or sales, $105,435 in expenses for contract labor, and a net profit of $4648. Based on the response, AOIC sent Rosas a premium adjustment notice on September 15, 2015 showing a total earned premium for the July 8, 2014 to July 8, 2015 period (first policy) to be $32,365 based on an audited payroll result of $105,435. Two days later AOIC sent Rosas a bill for $31,365 ($32,365 – $700 previously paid). Rosas disputed

the bill.  After receiving that bill, Rosas cancelled the second policy on September 24, 2015.

In response, AOIC conducted a cancellation audit for the period July 8, 2015 to September 25, 2015 (second policy).  This took place in Rosas's accountant's office.  The report from that audit states that Rosas was the "person providing description of duties.  The district court summarized the report:

> The report states for a 'Description of Operations':
>
> > The Insured is a roofing contractor working on primarily residential roofing projects in the Des Moines metropolitan area.  The Insured is contracted by general contractors to perform re-roofing projects for residential customers.  The Insured hires contract labor to assist with the roofing work.  No other duties performed by the Insured or their labor force.
>
> The report also states that Rosas is the owner and that his duties are, 'oversight of company operations, job site supervision, roofing labor.'
> The report states that a check register and general ledger were provided by Rosas.  It does not state that any other records were requested or provided.
> The report lists 11 individuals, other than Rosas, who were paid money by Rosas for 'roofing contract labor.'  It lists Rosas as having been paid for 'company management, job supervision, roofing labor.'  No other information was provided as to where or from who the list or these descriptions came from.  In a separate area of the report, the same 11 individuals were listed.  Here, under a section titled 'Notes (Double Click for Note Choices)', each of the 11 were described as 'Roofing contract labor, under the Insured's direction & control, works on the Insureds job sites, picked up for WC.'  Here, Rosas was described as, 'Company management, oversight of roofing jobs, roofing labor.'  Again, No other information was provided as to where or from who the list or these descriptions came from.

After this report, AOIC issued a "Premium Adjusted Notice" on November 18, 2015, adjusting the premium for second policy to $20,905.  The adjusted premium

included a $6735 penalty for early cancellation of the policy.  AOIC billed Rosas $20,105 ($20,905 – $800 previously paid).  Rosas did not pay.

AOIC sued Rosas for breach of contract seeking $51,770 in unpaid premiums plus pre- and post-judgment interest.  A default judgment was entered against Rosas, but later set aside upon agreement of the parties.  Rosas counter-claimed asserting AOIC acted in bad faith.  AOIC's motion for summary judgment was denied and the case was tried to the bench.  The district court dismissed both AOIC's petition and Rosas's counterclaim.  AOIC now appeals and Rosas cross-appeals.

## II.  Standard of Review.

This case was tried to the court as a law action and our review is for the correction of errors at law.  *Hendricks v. Great Plains Supply Co.*, 609 N.W.2d 486, 490 (Iowa 2000).  The district court's findings of fact have the effect of a jury verdict and are binding on us if supported by substantial evidence.  *Id.*  Evidence is substantial when a reasonable mind would accept it as adequate to reach the same findings.  *Id.*  Evidence is not insubstantial just because it would have supported contrary inferences.  *Id.*

## III.  Analysis.

### A.  Motion For Summary Judgment.

AOIC first argues the district court erred in denying its motion for summary judgment.  Rulings denying summary judgment are interlocutory.  *Estes v. Progressive Classic Ins.*, 809 N.W.2d 111, 114 (Iowa 2012) ("An order overruling a motion for summary judgment issue of material fact is a nonreviewable order when the district court finds a genuine issue of material fact exists and the case

proceeds to final trial."). "A district court's denial of a party's motion for summary judgment is no longer appealable or reviewable once the matter has proceeded to a trial on the merits." *Figley v. W.S. Indus.*, 801 N.W.2d 602, 607 (Iowa Ct. App. 2011). We decline to review the district court's denial of AOIC's motion for summary judgment. *Id.*

### B. Employees or Independent Contractors?

AOIC contends that Rosas breached his contractual obligation to pay the final workers' compensation insurance premiums AOIC claimed were due and owing on the two policies it issued. AOIC has the burden to prove all of the following: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that the plaintiff has performed all the terms and conditions required under the contract, (4) that the defendant breached the contract in some particular way, and (5) that the plaintiff has suffered damages as a result of the defendant's breach. *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010); see also *Holliday v. Rain and Hail L.L.C.*, 690 N.W.2d 59, 64 (Iowa 2004) ("The burden of proof on the plaintiffs was to prove a breach of contract by a preponderance of evidence.").

The district court found that there was an agreement between the parties and the only fighting issue was over the terms of the contract. The terms of the contract provides that AOIC will base its claim for the final premiums on the money paid or payable during the policy period for the services of: (1) all officer and employees engaged in work covered by this policy; and (2) all other persons engaged in work that could make us liable under policy. AOIC maintains Rosas used receipts from roofing jobs to pay employees, not independent contractors.

Rosas denies employing his fellow roofers and instead asserts they were independent contractors.

Five factors are used to determine an employer-employee relationship: (1) the right of selection, or to employ at will; (2) responsibility for payment of wages by the employer; (3) the right to discharge or terminate the relationship; (4) the right to control the work; and (5) the identity of the employer as the authority in charge of the work or for whose benefit it is performed. *Nelson v. Cities Serv. Oil Co.*, 146 N.W.2d 261, 265 (Iowa 1966). AOIC presented no direct evidence to show the existence of these factors. On the other hand, as the district court found, Rosas presented evidence that:

> • he and other self-employed roofers worked together on jobs, splitting the pay with no one of them being responsible for obtaining the work;
> • he was the payee for the jobs because he had "papers' and the other roofers did not;
> • he and the other roofers were paid by the job, not by the hour;
> • he had no control over how the other roofers did their work;
> • he and the other roofers used their own tools and equipment;
> • he did not train the other roofers how to do their work;
> • he and the other roofers were free to work with and for other people;
> • he did not withhold any taxes from or provide any benefits to the other roofers.

The court determined "None of the reliable evidence showed Rosas was anybody's employer." We agree.

And the district court concluded Rosas was one of a group of independent contractors working for themselves. To determine whether the roofers were independent contractors these eight factors are used:

> (1) The existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or of his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation

to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work, except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

*Swain v. Monona Cty.*, 163 N.W.2d 918, 921 (Iowa 1969). In applying these factors, we find no evidence in the record showing a contract between Rosas and the other workers. The nature of the business required for the workers to show up and use their independent skills to engage as roofers. There is no evidence that Rosas was directing the workers on how to perform their roofing tasks or control their progress of the work, except as to the final result. The record is also devoid of evidence that Rosas was furnishing necessary tools, supplies, and materials. We also do not find any evidence of Rosas employing the workers as assistants with the right to supervise the workers activities. The evidence establishes the roofers were independent contractors.

In sum, AOIC failed to provide sufficient evidence for us to find an employer-employee relationship between Rosas and his fellow roofers. We agree with the district court that "AOIC did not show that Rosas paid remuneration to persons engaged in work that could make AOIC liable to pay workers compensation." Thus, AOIC failed to meet its burden to prove Rosas owed additional premium.

All other arguments raised by AOIC on appeal not specifically addressed in this opinion are rejected.

**C. Bad-Faith Claim.**

On cross- appeal, Rosas seeks damages from AOIC claiming AOIC acted in bad faith in suing. The elements of bad faith are (1) the insurer lacked a reasonable basis for their action and (2) it knew or had reason to know it lacked a

reasonable basis. *See Dolan v. Aid Ins. Co.*, 431 N.W.2d 790, 794 (Iowa 1988).

A reasonable basis exists if the claim is fairly debatable either on a matter of fact

or law. *See Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149 (Iowa 1998).

"A claim is 'fairly debatable' when it is open to dispute on any logical basis. Stated

another way, if reasonable minds can differ on the coverage-determining facts or

law, then the claim is fairly debatable. The fact that the insurer's position is

ultimately found to lack merit is not sufficient by itself to establish the first element

of a bad faith claim." *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473

(Iowa 2005) (internal citations omitted). The court does not weigh conflicting

evidence that was before the insurer; the court is to decide whether evidence

existed to justify the insurer's action. *See id.* at 474.

The district court found

the actions of both parties[3] can fairly be labeled as lazy. AOIC did not seek clarification regarding the information it received from Rosas and made assumptions it shouldn't have without seeking more information. Rosas, on the other hand, had it within his power to nip this dispute in the bud by being forthcoming with information on his and his fellow roofers' business practices from the beginning. His providing self-serving information through counsel in October, 2018, didn't place any additional responsibilities on AOIC, who had its own, conflicting, information through its audit reports. The crucible of trial, such as it was, revealed that Rosas' evidence proved more reliable than AOIC's in the eyes of the court. The evidence was fairly debatable. There is no basis for a bad faith claim.

---

[3] Not their respective attorneys.

We agree both parties could have done more. Even so, after a review of the evidence, we also conclude AOIC's claim for more premiums is fairly debatable. So we agree with the district court there is no basis for a bad-faith claim.

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Mullins, J., concurs; Greer, J., concurs specially.

**GREER, Judge** (specially concurring).

I concur with the majority's decision that Auto-Owners Insurance Co. (AOIC) did not act in bad faith because the issue related to the premium increases was fairly debatable and, under the contract of insurance, the insurer could pursue answers to questions affecting the workers' compensation coverage. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). But I specially concur to address AOIC's position that the issues raised in this appeal are of first impression in Iowa. Consistent through the summary judgment, at trial, and now on appeal, AOIC frames these issues as:

> (1) May an insured submit evidence of independence of its workers after the audit period (policy period plus three (3) years) has closed and is the insurance carrier required, by contract or by law, to consider said evidence?
> (2) Do the contracts or the law impose any burden of production or investigation on the insurance carrier during the audit process or does that burden rest solely with the insured?

"When the district court denies a party's motion for summary judgment and the party appeals the final verdict, we review the issues raised in the unsuccessful motion for summary judgment based on the record made during trial . . . to determine if the district court committed error." *Estes v. Progressive Classic Ins. Co.*, 809 N.W.2d 111, 114 (Iowa 2012).

I, like the majority, view the issues raised in the context of a contract claim. I begin with the insurance contract between AOIC and Rosas. "The construction of an insurance contract and the interpretation of its language are matters of law for the court." *Ill. Nat-'l Ins. Co. v. Farm Bureau Mut. Ins. Co.*, 578 N.W.2d 670, 671 (Iowa 1998). I think it is important to address these questions because as noted in the majority opinion, AOIC is mandated to provide coverage, is bound,

and then the premium is calculated. Unlike traditional workers' compensation insurance where underwriting is involved first and a decision to reject or accept the risk can then be made, here the coverage is bound and the insurers serving the assigned risk market must agree to provide coverage among the various carriers involved. *See Travelers Indem. Co. v. Comm'r of Ins. of State*, 767 N.W.2d 646, 647 (Iowa 2009). So the AOIC assigned risk policy contains requirements to address the unknown risks the employer brings to the relationship.

Rosas noted on the application for coverage that his company was covering no employees, no helpers, and did not use any subcontractors. And he specifically asked to be excluded from coverage under the policy. That application caught the attention of underwriting since it meant the policy would only cover anyone that was working for him—doing jobs for him. As a part of the calculation of final premium, AOIC needed to identify for whom coverage was sought. At the trial, as the underwriter testified, the goal of workers' compensation insurance is to "provide work comp coverage for any claim that could occur during the policy term for the benefit of the insured and their employees, the workers." And from one vantage point in this record, one could view Rosas' claim "someone" told him to get workers' compensation insurance as a possible requirement by the general contractor who was arranging and contracting with the residential owners for the roofing jobs.[4] *See Lechuga v. O & J Enter., LLC*, No. 18-1455, 2019 WL 2524099, at *4 (Iowa

---

[4] Rosas testified a different contractor arranged for the job, got paid for the job, paid Rosas to do the work, and provided all of the materials. Rosas then paid individuals, many of whom lived with him. Without more, one could speculate the contractor arranging the jobs had more knowledge about the Rosas operation and how Rosas managed the workers than AOIC.

Ct. App., June 19, 2019) (speculating that evidence could suggest employer created the fiction there was a subcontractor agreement to insulate himself and the company from liability).

Likewise, Rosas was less than forthcoming when describing his operation to AOIC and its auditors.[5] So I would answer the questions AOIC identifies as follows.

*Do the contracts or the law impose any burden of production or investigation on the insurance carrier during the audit process or does that burden rest solely with the insured?*

I answer this second question first. Under this contract of insurance, I would find both parties have a duty during the audit process to fairly and fully investigate the risk and how that risk translates to a premium cost. First the purpose of Iowa Code chapter 515A (2014), regulating the assigned-risk policies, is to "promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminator." Iowa Code § 515A.1 (2014); *see Thomas v. Progressive Cas. Ins. Co.*, 749 N.W.2d 678, 682 (Iowa 2008) (noting that when a statute authorizes a contract of insurance, the statute forms a basic

---

[5] Under details provided by Rosas in the application, no one was covered under the policy, including Rosas. Next, when asked to detail "all helpers, day labor, contract labor, subcontractors and employees," Rosas offered a handwritten note signed by his "agent" saying "[h]e has no subcontractors and no helpers and no employees." But on the required worksheet that followed, the form noted "*I'm a sub-contractor for roofing companies and I sub-contract this job to different people.*" (Emphasis added.) To dispute the increased premium, Rosas sent a note saying:

> I Raul Rosas Ruiz did not take any taxes of any kind form the sub-contractors. I hired 4 sub-contractors last year when I need help on different jobs, none of the people where full time these 4 sub-contractors worked for many different contractors like me, as a result I always thought they were sub-contractors I did not know they need their own policy like I have.

part of the policy). Charging more than the premium necessary to cover risks related to a certain group of employees would defeat the stated statutory goal of avoiding excessive premiums. *See Travelers Indem. Co.*, 767 N.W.2d at 652 (finding question of excessive premium charged was resolved in insurer's favor where finding was unsupported that the insured had other insurance to cover workers' compensation claims for its interstate transportation services). Thus, the statute mandates that AOIC not overcharge its insured. Still, the terms of the policy also require Rosas to "keep records of information needed to compute premium" and "provide [AOIC] with copies of those records when we ask for them." I would find it is reasonable that an audit requirement presupposes that the exchange of information be mutual with AOIC requesting information and Rosas responding. I would find that AOIC completed its audit and met its duty under the contract of insurance and that Rosas did not. But the inquiry does not end there.

*May an insured submit evidence of independence of its workers after the audit period (policy period plus three years) has closed and is the insurance carrier required, by contract or by law, to consider said evidence?*

Next, I examine the first question, which AOIC raised to resolve the premium dispute. Arguing the time for Rosas to prove no liability under the policy for the additional premiums was only during the three-year term of the audit, AOIC points to the policy language. Because after the three-year audit period ended, Rosas finally offered an affidavit addressing the independent contractor status of the roofing workers he paid, AOIC contends, as a matter of law and contract, it is too late to dispute the additional premiums. AOIC fashions a good point. Because the premium is calculated after the insurer is bound, is it not fair to provide all information to assess the risk? By ignoring the responsibilities of the insured under

the policy of insurance to comply with the audit, an insurer could discover liability under the policy only after the fact when a qualifying employee is injured. Through the letters sent by AOIC, Rosas was aware of the audit, the stakes, and that he alone possessed the information that would contest the higher premium established.

Still, I believe we must turn to the policy language. In the summary judgment ruling, the district court best summarized the process under the contract to calculate the final premium.

> Under the terms of the insurance contract, AOIC reserved the right to modify the premium paid by Rosas and to audit his business to determine the final proper premium value. Under the Remuneration provision of the contract, AOIC determines the premium in the following way: . . . .
> The insurance contract provided the final premium "will be determined after this policy ends by using the actual, not estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy." Similarly, the contract contained an audit provision, which permitted AOIC to "conduct audits during regular business hours *during the policy period and within three years after the policy ends . . . [and] information developed by audit will be used to determine final premium.*"[6]

---

[6] The actual contract language under the heading "Audit" is:
> You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

The policy also required Rosas to "keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them."

(Alteration in original) (emphasis added). Thus, AOIC correctly reads this policy language as the means to resolve the final premium dispute, but we must read the policy in its entirety, rather than reading provisions in isolation. *See Thomas*, 749 N.W.2d at 681. In doing so, I would find another provision of the policy goes to the heart of this dispute. The final premium is only fair if it covers risks that are real. And under the policy, AOIC is at risk if, as AOIC notes in its brief, "the insured's operation could make AOIC liable for workers' compensation benefits under the policies it issued to [Rosas]." The summary judgment court so noted, stating, "The Court can determine that, as a matter of law, at the time of the audits and up through October 10, 2018,[7] AOIC had information that *suggested* it 'could' be made liable for those workers." (Emphasis added.) AOIC asserts this language seals the deal and the additional premiums are due. That language used by the summary judgment court tracks a provision in the premium section of the policy:

> C. Remuneration
>     Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
>     1. All your officers and employees engaged in work covered by his policy; and
>     2. *All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy.* If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

---

[7] This was the date of the affidavit of Rosas addressing the elements of the independent contractor status of the roofers. The affidavit also included Form 1099's to establish the roofers were paid by Rosas as independent contractors.

(Emphasis added.) So returning to question one: is Rosas allowed to contest and offer additional information about the independence of the other roofers after the audit period ends? I believe the policy language does not prohibit Rosas from contesting the application of "the proper classifications and rates that lawfully apply to the business and work covered by this policy" as a matter of contract law. After all, as the majority correctly points out, Rosas cannot be liable for workers' compensation coverage for any independent roofing contractors. Generally, "an employer of an independent contractor is not vicariously liable for injuries arising out of the contractor's negligence." *Downs v. A & H Constr., Ltd.*, 481 N.W.2d 520, 523–24 (Iowa 1992). If the final premium is calculated using an improper classification, rate, or employment status, the question of "could make us liable" must be answered. AOIC submits that question was answered in its favor, arguing a worker is an "employee" unless proven otherwise. *See Daggett v. Nebraska-E. Exp., Inc.*, 107 N.W.2d 102, 105 (Iowa 1961). AOIC asserts the limited information provided did not rebut this presumption. AOIC concedes Rosas answered the relevant questions in the test for determining independence of the workers. *See Swain v. Monona Cty.,* 163 N.W.2d 918, 921 (Iowa 1969). Yet, AOIC failed to rebut any of the Rosas' answers with evidence to the contrary, instead relying upon the argument the proof was inconclusive.

Finally, even in the cases cited by AOIC for guidance on the issues of first impression, decisions addressed and answered the underlying qualifying question of the appropriateness of applying the requested premium. *See Gridiron Mgmt. Grp. LLC v. Travelers Indem. Co.*, 839 N.W.2d 324, 328–29 (Neb. 2013) (affirming the agency decision to apply the modifier used to calculate the premium due from

the successor company, where the district court considered the evidence and argument presented on the agency review); *Travelers Indem. Co. v. Int'l Nutrition, Inc.*, 734 N.W.2d 719 (Neb. 2007) (determining the adjustment of the classification code was correct after considering the evidence and arguments). Had the qualifying question been answered in AOIC's favor, under the policy, the calculation of premium would have stood. But, the policy terms provide that a premium is not owed unless the evidence showed the roofers were either employees or "*persons engaged in work that could make us liable*," and I agree with the majority's conclusion the evidence we were provided did not make that necessary connection for coverage.